Ava **WILLIAMS**, Plaintiff,

v.

**TRANS–WORLD AIRLINES, INC., Defendant.**

No. 77–0826–CV–W–5.

United States District Court, W. D. Missouri, W. D.

Nov. 10, 1980.

William H. Pickett, P. C., Kansas City, Mo., for plaintiff.

Robert L. Driscoll, Randall E. Hendricks, Stinson, Mag & Fizzell, Kansas City, Mo., for defendant.

## ORDER AND MEMORANDUM

SCOTT O. WRIGHT, District Judge.

This is an action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.*, and the Civil Rights Act of 1866, 42 U.S.C. § 1981, in which plaintiff, Ava Williams, alleges that her discharge from employment by defendant was the result of discrimination on the basis of race. Defendant alleges that plaintiff's discharge was motivated solely by poor job performance, insubordination, and poor attitude. For the reasons stated below, this Court finds that judgment should be entered in favor of plaintiff and against defendant on her claim under 42 U.S.C. §§ 2000e, *et seq.*, and that judgment should be entered in favor of plaintiff and against defendant on her claim under 42 U.S.C. § 1981.

## FINDINGS OF FACT

1. Ava Williams, plaintiff, is a black female citizen of the United States.

2. Defendant is an "employer" within the meaning of 42 U.S.C. § 2000e.

3. On April 25, 1976, plaintiff became employed by the defendant as a probationary employee in the job classification of flight attendant.

4. She was in a training program as a student hostess until May 20, 1976.

5. At the time of her discharge, plaintiff was serving a five-month probationary period during which time she could be terminated without union intervention.

6. Plaintiff was stationed in the Kansas City domicile during her probationary period.

7. Daphne Halderman was plaintiff's coordinating supervisor. This was the first time Ms. Halderman had performed in this type of supervisory capacity.

8. Nedra Rosen was the Manager of Training for the Kansas City domicile and performed supervisory functions with respect to Ava Williams during Ava's tenure as a probationary employee.

9. During the probationary period, the flight attendant's supervisor or supervisors are responsible for evaluating the performance of the probationary employees. If, in the opinion of the supervisor, the probationary flight attendant is not performing the duties in a satisfactory manner, the employee may be discharged.

10. All of the written evaluations of Ava's job performance were complimentary. She received good evaluations on her job appearance, passenger service, knowledge of safety regulations and procedures, etc. These evaluations were written by Daphne Halderman, Stan Jennings, and J. G. West.

11. In the written evaluations, none of the supervisors expressed an opinion that Ava was not properly performing the duties of a flight attendant in a satisfactory manner.

12. During plaintiff's training period, she was criticized for looking bored in class. Daphne Halderman discussed this problem with plaintiff, and plaintiff explained that she was not bored, but merely trying to concentrate on the subject material.

13. In June or early July, 1976, plaintiff was twice caught wearing cut-off jeans in the public areas of the TWA terminal at MCI Airport while she was off-duty and on purely personal business. On the first occasion, plaintiff's supervisor, Daphne Halderman, warned plaintiff that such attire was a violation of company policy. Plaintiff thought that Daphne was joking and did not believe that wearing cutoffs in the terminal was against company policy.

14. A few days later, Daphne observed plaintiff again wearing cut-off jeans in the terminal and reprimanded plaintiff. Plaintiff asked to see the written regulations which prohibited flight attendants from wearing cut-off jeans in the terminal while they were on personal business.

15. At a conference with plaintiff on July 17, 1976, Daphne showed plaintiff TWA's Front Line Handbook, dated May 1975, which states

When not in uniform but at the airport conducting business, or deadheading, dress should be tastefully conservative.

16. There was no formal TWA regulation which specifically prohibited flight attendants from wearing cut-off jeans in the terminal while they were off-duty and conducting personal business.

17. On July 17, 1976, several supervisors observed plaintiff exhibiting signs of boredom in a one-day training seminar commonly referred to as the "three-month seminar" or the "achievement seminar."

18. Immediately after the seminar, plaintiff's supervisor, Daphne Halderman, and another supervisor, Dennis Bates, called plaintiff into an office to discuss her "attitude problem." The instances of the cutoff jeans and her apparent boredom in the seminar were the issues discussed. Feeling unduly harassed, plaintiff became angry. Nedra Rosen, a third supervisor, was called

in to help deal with plaintiff. When Nedra talked with plaintiff, plaintiff was very calm and composed.

19. At this meeting with her supervisors, plaintiff was warned that she must display exemplary conduct during the rest of her probationary period.

20. On July 19, 1976, defendant sent plaintiff a written memorandum confirming the meeting with her supervisors regarding plaintiff's "overall actions and attitude." This written warning stated:

"You must display an exemplary performance during the remainder of your probationary period. Should a future incident occur which indicates any type of attitude problem on your part, you may be subject to termination."

21. The general rules of conduct established for flight attendants are set forth in the TWA In-Flight Service Handbook, Section 4.01, July 1, 1975. Twenty rules are enumerated, but only the following two have any relevance to this case:

5. Neglect of duty and insubordination will not be tolerated.

.    .    .    .    .

16. All duties shall be performed in a professional and workmanlike manner.

22. A notation after the last general rule of conduct states:

Violation of any of these regulations may result in disciplinary action ranging from warning to discharge. The measure of discipline should correspond to the gravity of the offense as weighed by its effect on the Company as well as the seniority and work record of the employee involved.

23. On August 1, 1976, plaintiff served as a flight attendant on a flight which was delayed for six hours on the ground in Colorado Springs, Colorado.

24. About four weeks later, defendant received a letter from a passenger who had been on that flight. This passenger, Mrs. DeVitt, accused plaintiff of "prostituting" herself with a "black" passenger during the flight and of neglecting her duties to other passengers. Mrs. DeVitt referred to plaintiff as the "black" stewardess.

25. In a meeting on September 2, 1976, Daphne Halderman and Nedra Rosen informed plaintiff that they were going to terminate her on the basis of this passenger complaint. They read Mrs. DeVitt's letter to plaintiff, but withheld the passenger's name.

26. Plaintiff denied all wrongdoing on the six-hour grounding of the flight from Chicago to Denver that occurred in Colorado Springs, Colorado because of weather.

27. The decision to discharge plaintiff was jointly made by supervisors Nedra Rosen and Daphne Halderman, with approval given by Jane O'Boyle, Acting General Manager of the Kansas City domicile and by Robert Kaps, head of Labor Relations for In-Flight personnel.

28. None of the other crew members on the flight in question were asked to substantiate the allegations in Mrs. DeVitt's letter prior to plaintiff's termination.

29. The only investigation conducted prior to plaintiff's termination was verification by Mr. Kaps that the letter was a bona fide passenger complaint. The truth of the matter contained in the letter was never verified by TWA prior to the termination of plaintiff.

30. The letter of Mrs. DeVitt contained obvious racial overtones.

31. The letter of September 2, 1976, terminating the employment of plaintiff with the defendant, stated that plaintiff was terminated because of her neglect of duty and her failure to perform her duties in a professional and workmanlike manner.

32. Plaintiff's employment was terminated by TWA solely on the basis of Mrs. DeVitt's unsubstantiated letter, which contained obvious racial overtones.

33. Daphne and Nedra did not believe that the plaintiff had "prostituted" herself on the plane. Even though they both felt that this part of the letter was untrue and exaggerated, they chose to believe a part of the letter to the extent that they terminat-

ed plaintiff on the basis of the letter without any further investigation. Plaintiff was terminated on the basis of a racially motivated letter which contained allegations that cast serious doubts upon the credibility of the passenger writing the letter.

34. No investigation was conducted concerning this letter prior to plaintiff's termination because plaintiff's probationary period was nearly over, and, in the opinion of plaintiff's supervisors, there was not enough time for an investigation because action had to be taken quickly. Defendant extended the probationary period of a caucasion flight attendant, Dale Taylor, when circumstances warranted it, i. e. she had been involved in a car accident.

35. Under normal circumstances, complaints are investigated by defendant before disciplinary action is taken. If an immediate investigation cannot be made, disciplinary action is deferred.

36. During the relevant time period, Daphne Halderman was directly involved in firing one other probationary flight attendant besides the plaintiff. She was also black.

37. Plaintiff did not "prostitute" herself during the six-hour grounding in Colorado Springs on the flight between Chicago and Denver. Plaintiff did not neglect her duties to other passengers. Plaintiff did speak to a black male passenger during this time, but her behavior was not improper or unusual, and she did not speak with him for an unusual length of time.

38. After plaintiff's termination, TWA investigated the charges brought against plaintiff by the passenger, Mrs. DeVitt. The other crew members on the flight in question reported that they had not noticed anything improper, unusual, or disgraceful about plaintiff's behavior during this time.

39. There was no truth in the complaint letter written by Mrs. DeVitt which served as the basis for terminating plaintiff's employment with the defendant.

40. On September 2, 1976, the date of her discharge, plaintiff filed a charge of discrimination against defendant with the Equal Employment Opportunity Commission (EEOC).

41. The EEOC investigated the charge of Ava Williams and made a determination of probable cause that TWA had discriminated against plaintiff. This decision was made on April 28, 1977.

42. On August 9, 1977, plaintiff requested a Notice of the Right to Sue letter.

43. The Notice of the Right to Sue was mailed on or about August 27, 1977.

44. This action was filed on November 22, 1977, within 90 days after plaintiff received her Notice of the Right to Sue.

45. Plaintiff was a full-time student from January 10, 1977 until May 13, 1978, including the summer of 1977. Plaintiff obtained a better paying job after her graduation from school.

46. Plaintiff earned $250.00 as a substitute teacher between the date of her termination and the date she became a full-time student.

47. Plaintiff received $1,040.00 in unemployment benefits between the time of her termination and the date she became a full-time student.

48. A flight attendant with the same seniority date as the plaintiff would have earned $2,693.02 in salary and $344.20 in incentive pay for the period between plaintiff's termination and the date she became a full-time student.

49. A flight attendant is entitled to four trip passes a year on a space available basis.

50. Plaintiff would have been entitled to dental and medical insurance while she was employed by defendant.

## CONCLUSIONS OF LAW

1. Plaintiff has exhausted her administrative remedies as required under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq., and jurisdiction under that statute is proper in this Court.

2. This Court has jurisdiction over the subject matter of plaintiff's claim under 42 U.S.C. § 1981.

3. Plaintiff has made a prima facie case of racial discrimination.

4. Defendant has failed to rebut plaintiff's prima facie case, and the defendant's act of terminating plaintiff's employment on September 2, 1976, was in violation of 42 U.S.C. §§ 2000e *et seq.*, and in violation of 42 U.S.C. § 1981.

5. The discrimination against plaintiff was intentional under 42 U.S.C. § 1981 within the meaning of *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976).

6. The plaintiff is entitled to reinstatement, back wages, lost fringe benefits, the cost of this action and reasonable attorney's fees.

## OPINION

### A. TITLE VII

The evidence in this case is unique because it does not fit neatly into any of the major theories normally used to prove discrimination. Nevertheless, plaintiff proved a prima facie case of discrimination which the defendant failed to rebut, and judgment must be entered in favor of plaintiff.

The disparate treatment theory and the disparate impact theory are the two major theories used to prove discrimination. A plaintiff makes a prima facie case of discrimination under the disparate treatment theory by showing that the defendant treated the plaintiff differently than members of a nonprotected class. *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). A plaintiff makes a prima facie case of discrimination under the disparate impact theory by showing that a facially neutral policy or practice used by defendant operates to adversely affect a protected class. *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971).

Plaintiff attempted to make her prima facie showing of discrimination using the disparate treatment theory. Defendant contends that plaintiff failed to show she was treated differently than similarly situated white employees and, therefore, her case must fail. The Court agrees that plaintiff failed to prove disparate treatment by the standards of proof set forth in *McDonnell Douglas* and *Furnco*. Plaintiff attempted to prove disparate treatment by introducing parts of personnel files showing that white employees were subject to less severe disciplinary measures than the plaintiff was, but the evidence presented by plaintiff on this issue has little probative value. First, the files of other personnel introduced by plaintiff are incomplete and fail to show that these persons were similarly situated as the plaintiff. Second, the disciplinary measures reflected in these files were imposed by different supervisors at different domiciles. In Title VII cases, comparative evidence should be complete and should adequately show that one group of people are similarly situated before the inference may be drawn that persons of one race were treated differently from persons of another.[1] Therefore, the portions of personnel files introduced by plaintiff have little probative value and fail to make out plaintiff's prima facie showing of discrimination.

However, the disparate treatment theory in *McDonnell Douglas* and *Furnco* and the disparate impact theory are not exclusive ways of proving discrimination.[2] They are only a means of doing so, and were "never intended to be rigid, mechanized, or ritualistic. Rather, [they are] merely ... sensible, orderly way[s] to evaluate the evidence in light of common experience as it bears on the critical question of discrimination." *Furnco Construction Corp. v. Waters, supra*, 438 U.S. at 577, 98 S.Ct. at 2949, 57 L.Ed.2d 957. The Court in *McDonnell Douglas* noted that "[t]he facts necessarily will vary in Title VII cases, and the specification above of the prima facie proof required from

---

1. *See* EEOC Interpretive Manual § 132.5(c).

2. In her pleadings, the plaintiff has alleged only disparate treatment, but under Rule 15(b), Fed.

Rules Civ.Proc., the Court may consider other evidence of discrimination.

[plaintiff] is not necessarily applicable in every respect to differing factual situations." *McDonnell Douglas Corp. v. Green*, 411 U.S. at 802 n. 13, 93 S.Ct. at 1824 n. 13, 36 L.Ed.2d 668. The Eighth Circuit Court of Appeals has defined a prima facie case as consisting of "facts sufficient to sustain the inference that the challenged action of the employer was motivated by impermissible considerations." *Mosby v. Webster College*, 563 F.2d 901, 903 n. 2 (8th Cir. 1977).

■ The language of the opinions is consistent with the liberal spirit and purpose of Title VII, and the plaintiff is not confined to "rigid, mechanized, or ritualistic" standards of proof as long as she can meet her initial burden of showing a nexus between the challenged employer action and the plaintiff's race.[3] The ultimate finding for the trier of fact in this racial discrimination case is whether the plaintiff was terminated because she is black. Usually, the nexus between the employer's action and the plaintiff's race is proved by showing disparate treatment or disparate impact, but these two theories are only means of proving by indirect evidence that which usually cannot be proved by direct evidence. Proving disparate treatment or disparate impact merely raises an inference of discrimination and creates a legal fiction because "we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." *Furnco Construction Corp. v. Waters, supra*, 438 U.S. at 577, 98 S.Ct. at 2949, 57 L.Ed.2d 957; *see also, International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 358 n. 44, 97 S.Ct. 1843, 1866 n. 44, 52 L.Ed.2d 396 (1977).[4] Creating this legal fiction is unnecessary, however, when direct evidence shows the nexus between the employer's action and the plaintiff's race.

In this case, the direct evidence linking plaintiff's termination to her race is a passenger complaint letter written with strong racial overtones, and which prompted plaintiff's termination.[5] The passenger, Margo DeVitt, referred to plaintiff as the "black" stewardess who "prostituted" herself with a

3. The importance of *McDonnell Douglas* lies, not in its specification of the discrete elements of proof there required, but in its recognition of the general principle that any Title VII plaintiff must carry the initial burden of offering evidence adequate to create an inference that an employment decision was based on a discriminatory criterion illegal under the Act.
*International Brotherhood of Teamsters v. United States*, 431 U.S. 324 at 358, 97 S.Ct. 1843 at 1866, 52 L.Ed.2d 396 (1977).

4. Although the *McDonnell Douglas* formula does not require direct proof of discrimination, it does demand that the alleged discriminatee demonstrate at least that his rejection did not result from the two most common legitimate reasons on which an employer might rely to reject a job applicant: an absolute or relative lack of qualifications or the absence of a vacancy in the job sought. Elimination of these reasons for refusal to hire is sufficient, absent other explanations, to create an inference that the decision was a discriminatory one.
*International Brotherhood of Teamsters v. United States, supra* note 3, 431 U.S. at 358 n. 44, 97 S.Ct. at 1866 n. 44, 52 L.Ed.2d 396.

5. Dear Sir,
My family was on TWA flight 121 from Chicago to Denver on Aug. 1. Because of the flood, flight times were markedly altered.
My letter is to commend the crew on our plane.
The steward Bruce was outstanding in his ability to entertain the many children on board and in keeping his sense of humor with adults. He is an asset to your airline.
The capitans [sic] (for lack of knowledge of titles) were honest with the passengers on our predicament and kept us well informed. They also had a good sense of humor which easily spread—it was needed that night!
However, the black stewardess (Ava, I believe) was a disgrace. She prostituted with a *black passenger so much* that those of us in the rear of the plane got so we were cheering her on. It was too obvious and not a tribute to TWA. With all the other staff running constantly to appease passengers, she sat on or next to this one man. She only assisted when directly asked to do so.
I assume that you will appreciate this information. My husband and I are both in charge of personnel and would value an outsider's input if one of our staff behaved in such a manner.
Not to slight the other stewardesses—they made an unbearable situation almost fun—an adventure. In the same light, I hope they will also hear of my letter.
Sincerely
Margo DeVitt
& 3 six year olds.

"black" passenger during a six-hour layover in Colorado Springs. Mrs. DeVitt notably did not choose to describe any of the other flight attendants on board by the color of their skin. Instead, she referred to them by their first names. She testified in her deposition that she knew plaintiff's name because she was wearing a name tag (DeVitt depo. 9), yet, she chose to refer to plaintiff as the "black" stewardess.

Further evidence that Mrs. DeVitt's letter was racially motivated is the gross exaggeration of terms used to describe plaintiff's conduct. Even TWA's witnesses admitted that they did not believe that plaintiff prostituted herself on board that flight. The word "prostituted" is a strong term. It describes more than just a course of conduct, it describes a crime. It is not a term to be used lightly, particularly in a letter which may jeopardize someone's career and livelihood. Obviously, Mrs. DeVitt harbored great hostility towards the plaintiff. The question is why? Mrs. DeVitt did not indicate in her letter, or in her deposition, any reason why she personally should be hostile towards the plaintiff. There is no evidence that the plaintiff refused Mrs. DeVitt or her family service or that plaintiff did anything to personally affront Mrs. DeVitt. Although Mrs. DeVitt had no personal complaint against plaintiff, she wrote what defendant rightfully calls a "scathing" letter which, as it turned out, had little or no foundation in fact. Unquestionably, the letter written by Mrs. DeVitt was racially motivated, and the Court is convinced that if Mrs. DeVitt had seen a white stewardess behaving in the same manner towards a white passenger, no letter of complaint would have been written.

Of course, TWA cannot be held responsible for a letter written by one of its passengers, no matter how libelous or racially motivated. But, TWA can be held liable for the action it took as a result of that letter. Without verifying the facts recited in the letter, TWA terminated plaintiff on the basis of that letter.[6] Mrs. DeVitt's letter had obvious references to plaintiff's race. It contained gross exaggerations, which TWA's witnesses admitted that they did not believe. TWA had reason to doubt the credibility of the letter on its face. TWA's witnesses also testified that it was highly unusual for a probationary flight attendant to receive a passenger complaint letter. In spite of all of these warning signs—obvious racial overtones, gross exaggerations, and the rarity of this type of letter—TWA terminated plaintiff on the basis of this letter *without investigating* the underlying facts. No reasonable person could have read that letter and not been alerted to the strong likelihood that this letter was racially motivated. Had TWA investigated the facts, they would have found little or no truth in the letter, and Ava Williams would not have been terminated. When TWA acted upon an unsubstantiated letter, TWA adopted that letter as its own, complete with racial overtones and gross exaggerations.

█ The following facts are sufficient to make out plaintiff's prima facie case of discrimination: A passenger, who had no personal complaint against plaintiff, wrote a grossly exaggerated complaint letter which contained references to plaintiff's race. This fact raises the unrebutted inference that the letter was written because plaintiff is black. TWA adopted the letter and terminated plaintiff without investigating or verifying the truth of the letter. If this racially motivated letter had not been written, or if TWA had investigated the letter, plaintiff would not have been fired. These facts raise a very strong inference

---

**6.** Plaintiff's termination letter dated September 2, 1976 states in relevant part:

Dear Ms. Williams:

This will confirm our conversation of September 2, 1976, which resulted in the termination of your employment with TWA as of that date. In TWA's in-flight service handbook it is stated that neglect of duty will not be tolerated. The general rules of conduct prescribes that all flight attendant duties shall be performed in a professional and workmanlike manner. You were terminated because you failed to uphold these rules of conduct and because you have not promoted TWA's best interest.

that plaintiff was fired because she is black.[7]

■ But, before the Court can reach this conclusion, defendant's rebuttal evidence must be examined. *McDonnell Douglas Corp. v. Green, supra; Furnco Construction Corp. v. Waters, supra.* The main thrust of defendant's rebuttal evidence centered on showing other occurrences which allegedly justified plaintiff's termination. Generally, in individual discharge cases, a defendant rebuts a plaintiff's prima facie case by showing a legitimate, nondiscriminatory reason for firing the plaintiff. This standard is inapplicable in this case, however, because plaintiff's termination letter dated September 2, 1976 makes it clear that plaintiff was terminated on the basis of the charges made in Mrs. DeVitt's letter, i. e., for neglect of duty and for failure to perform her duties in a professional and workmanlike manner. This letter forecloses defendant from now asserting that plaintiff was terminated for reasons other than this passenger complaint letter, and only evidence relating to this circumstance would be relevant in rebutting plaintiff's prima facie case.

Defendant could have rebutted plaintiff's prima facie case in either one of two ways. Defendant could have broken the connection between plaintiff's race and her termination by showing that the letter was true, thereby negating the strong inference that the letter was racially motivated. Or, the defendant could have exonerated its own conduct in the affair, either by showing its supervisors investigated the letter or by showing a compelling business necessity why its supervisors could not have investigated the letter prior to plaintiff's termina-tion. By one means or another, evidence on all three issues was presented at trial.

Defendant's evidence failed to rebut plaintiff's prima facie case by showing that the letter was true. TWA's own witnesses testified that they did not believe part of the letter. If there was reason to doubt part of the letter, there was reason to doubt the whole. The passenger referred to in the letter also testified, and he denied any wrongdoing on the part of the plaintiff. Even though he admitted trying to flirt with her, she had not flirted with him, and he could not remember her talking to him except for a short period of time. The most *compelling evidence of the falsity of the* letter is Mrs. DeVitt's own deposition. Clearly, the plaintiff was not engaged in "prostituting" herself. Mrs. DeVitt's depositional testimony, at most, establishes that plaintiff carried on a friendly conversation with this passenger, which is conduct hardly deserving of so harsh a term. The thrust of Mrs. DeVitt's complaint against plaintiff was her conduct toward this passenger, and this complaint had no foundation in truth. Mrs. DeVitt's overt references to plaintiff's race, the gross exaggeration of terms used, and the fact that Mrs. DeVitt had no personal complaint against plaintiff raise a very strong inference that Mrs. DeVitt's letter was racially motivated. Thus, because plaintiff was fired because of the letter, plaintiff was fired because of her race.

But, as the Court stated previously, TWA is not being held liable for a letter written by one of its passengers. TWA is being held liable for its own conduct in reacting to that letter.[8] Therefore, TWA could also rebut plaintiff's prima facie case by exoner-

7. It appears that plaintiff's case could have been most easily proved under a disparate impact theory. Plaintiff should have attempted to prove that it was TWA's policy or practice to fire flight attendants after receiving a passenger complaint letter. Because black flight attendants would be more likely than white flight attendants to receive untruthful passenger complaint letters motivated by racial prejudice, TWA's facially neutral policy or practice would have an adverse impact on plaintiff's protected class.

8. TWA is not being held liable for failing to investigate that letter *per se.* The Court is not mandating that TWA investigate every passenger complaint letter to make sure it is not racially motivated. However, in this particular instance, the face of the letter was sufficient to put the defendant, or any reasonable person, on notice that it was motivated by racial considerations.

ating its own conduct in plaintiff's termination. For the reasons stated, however, TWA failed to do this.

As stated previously, TWA could have done this either by showing a bona fide investigation of the facts or by showing a compelling business necessity why an investigation could not be made.

Defendant's own witnesses testified that there was no investigation conducted to verify the facts of Mrs. DeVitt's letter prior to plaintiff's termination. The testimony showed that a Mr. Kaps verified that the letter was a valid passenger complaint, and an unsuccessful attempt was made to contact the other flight attendants, but TWA had no information at the time of plaintiff's termination which showed either the truth or falsity of the letter.

Defendant also failed to show any compelling business necessity why an investigation could not be made. Nedra Rosen, Manager of Training for TWA in Kansas City, testified that, generally, investigations were made of passenger complaints prior to a termination. She further testified that this could not be done in plaintiff's case because it was nearing the end of plaintiff's probationary period. If TWA had waited to investigate the letter, plaintiff would not have been a probationary employee, and she would have been protected by the union contract. This reason does not constitute a compelling business necessity, and does not justify the action even by routine business considerations. Cf. *Kirby v. Colony Furniture Co., Inc.*, 613 F.2d 696 (8th Cir. 1980) (discusses burden of proof concerning business necessity under disparate impact theory). This is particularly true in light of the fact that the evidence shows that TWA had other alternatives. Dale Taylor, a flight stewardess for TWA, testified that her probationary period had been extended due to extenuating circumstances. TWA could have likewise extended plaintiff's probationary period pending investigation of the letter. Nothing in the record indicates that TWA even considered doing this, but instead rushed through with plaintiff's termination. The evidence produced is not sufficient to show that TWA had a legitimate business reason for failing to investigate the letter before plaintiff's termination.

As mentioned earlier, defendant's main evidence of rebuttal centered on showing certain incidents in plaintiff's past work history to justify her termination. However, plaintiff's termination letter dated September 2, 1976 clearly shows that plaintiff was terminated on the basis of the allegations set forth in Mrs. DeVitt's letter, and plaintiff's prior work history has little relevance in rebutting plaintiff's prima facie case. Nevertheless, the defendant's evidence merits discussion because it bears on the issue of intent and further strengthens plaintiff's case.

At the outset, the Court wants to emphasize the fact that all of defendant's evaluations of plaintiff's performance of job-related duties were very good, and prior to Mrs. DeVitt's letter, plaintiff's personnel file did not reflect any rule infractions which were job-related. Defendant's rebuttal evidence did not involve any incidents relating to plaintiff's work history *per se*, but involved several personal confrontations with plaintiff's supervisors.

The defendant's evidence focused on several different occurrences. On two occasions plaintiff was caught in the TWA terminal wearing cut-off blue jeans while she was off-duty and on strictly personal business. On several other occasions, plaintiff was observed looking bored in training classes or seminars. Daphne Halderman reprimanded plaintiff about this conduct several different times. Each time Halderman reprimanded plaintiff about these situations, plaintiff became what TWA described as insubordinate, challenging the authority of her supervisors. Immediately following one of these episodes, Daphne Halderman issued a warning letter to plaintiff informing her that any further disciplinary problems would result in termination. TWA asserts that plaintiff's insubordination and poor attitude contributed to and justified plaintiff's termination.

But, upon closer analysis of these facts, it is not the plaintiff's conduct that the Court

questions, but TWA's. The conduct of TWA's supervisors in these instances was nothing less than harassment. On two occasions, Daphne Halderman reproved plaintiff for wearing cut-off blue jeans in the terminal while she was off-duty and on personal business, even though TWA had no regulation governing a flight attendant's wearing apparel in these circumstances. Furthermore, the excuse that plaintiff looked "bored" in classes is so patently absurd and so totally subjective that the Court would feel foolish in recognizing it as a legitimate defense. Plaintiff's "insubordination" and "poor attitude" towards this type of harassment was merely a normal human reaction to irrational and illogical conduct on the part of TWA's supervisors. Defendant's evidence did not rebut plaintiff's prima facie case of discrimination under her Title VII count.

### B. 42 U.S.C. § 1981

A finding of discrimination under Title VII is not necessarily a finding of discrimination under 42 U.S.C. § 1981. Section 1981 requires a specific finding of discriminatory intent. *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). Discriminatory intent need not be proved by direct evidence, but may be inferred from the circumstances.

One can infer discriminatory intent in this case from the following circumstances: TWA's harassment of plaintiff prior to her termination over non-existent or trivial infractions; the issuance of the warning letter even though plaintiff's work record was exemplary; plaintiff's termination on the basis of a passenger complaint letter which had obvious racial overtones and which TWA admitted was not credible on its face because of its gross exaggerations; and TWA's failure to investigate this letter, in spite of all the warning signs, because TWA wanted to terminate plaintiff before her probationary period ended. These circumstances rise close to the level of overt discrimination and are more than sufficient to raise the inference of discriminatory intent on the part of TWA. Plaintiff made a prima facie case of intentional discrimination under Section 1981, which the defendant failed to rebut.

### C. DAMAGES

The purpose of Title VII is to make the plaintiff "whole," *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975), and a successful plaintiff is entitled to reinstatement with full seniority benefits and back pay from the date of termination up to the date of reinstatement. Plaintiff is also entitled to any fringe benefits she would have received had she not been terminated.

Fringe benefits are extremely difficult to calculate in this type of case. In reviewing the evidence, there are three types of fringe benefits which the Court could award here. Flight attendants are entitled to incentive pay, and the defendant provided comparative wage histories of two other flight attendants who had approximately the same seniority date as the plaintiff. The evidence shows that during plaintiff's employment with the defendant, she was willing to put forth extra effort. One instance would be the time she made a "short call" to replace another stewardess on a flight. Daphne Halderman commended her on her fine efforts and behavior. Therefore, it is entirely reasonable to assume that if plaintiff had remained in TWA's employment, she would have received incentive pay, and this should be awarded.

Trip passes are another type of fringe benefit that the Court is in a position to award. A flight attendant is entitled to four trip passes per year on a stand-by basis, and these should also be awarded to plaintiff in kind.

If plaintiff had remained in defendant's employment, she would also have been entitled to medical and dental insurance. Plaintiff should be awarded the cost of this insurance.

Both parties have stipulated that the relevant time period for computing back pay is from September 3, 1976 to January 9, 1977, at which time plaintiff

became a full-time student and then later obtained a better paying job. A plaintiff is not entitled to back pay for any period spent as a full-time student, *Taylor v. Safeway Stores, Inc.*, 524 F.2d 263 (10th Cir. 1975). Any interim earnings or unemployment compensation received during the relevant time period should also be deducted pursuant to Section 706(g) of Title VII. The plaintiff's monetary damages under Title VII in this case can be computed by the following formula:

|  |  |  |
|---|---|---|
| $ 2,693.02 | | back pay from September 3, 1976 – January 9, 1977 |
| plus | | |
| $ 344.20 | | incentive pay (fringe benefits) |
| plus | | |
| 93.98 | | cost of medical and dental insurance to defendant |
| Total $ 3,131.20 | | |
| minus $ 884.75 | | Taxes (federal, F.I.C.A., State N.J.) |
| minus $ 250.00 | | earnings received as substitute teacher |
| minus $ 1,040.00 | | unemployment compensation |
| Total $ 956.45 | | |

Under Section 1981, plaintiff is also "entitled to both equitable and legal relief, including compensatory and, under certain circumstances, punitive damages." *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 460, 95 S.Ct. 1716, 1720, 44 L.Ed.2d 295 (1975). Plaintiff is entitled to back pay, which, in this case, is the equivalent of her damages under Title VII. Although plaintiff is entitled to compensatory damages, she failed to carry her burden of proof, and compensatory damages cannot be awarded. Plaintiff testified that she lost sleep and appetite and suffered a general malaise and underwent psychiatric care. Although the Court finds this testimony entirely credible and even likely in light of the circumstances, it is simply inadequate to base an award of damages upon. The psychiatrist's report and medical bills should have been submitted to the Court, and more detail should have been discerned about plaintiff's illness, such as duration, severity, etc. Any award of damages would be based on sheer speculation.

The Court also declines to award punitive damages. The conduct of the defendant was not shown to be willful, wanton or malicious, and an award of punitive damages would be inappropriate in this instance. *Wright v. Owen*, 468 F.Supp. 1115 (E.D.Mo.1979).

The plaintiff's damages under Section 1981 are limited to an amount equal to her damages under Title VII.

## D. ATTORNEY'S FEES

An award of attorney's fees is governed by the standards set forth in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974), which were adopted by the Eighth Circuit in *Allen v. Amalgamated Transit Union*, 554 F.2d 876, 884 (8th Cir. 1977). In computing plaintiff's award of attorney's fees, the Court will follow the procedure adopted in *Cleverly v. Western Electric Co., Inc.*, 450 F.Supp. 507 (W.D.Mo. 1978), *aff'd*, 594 F.2d 638 (8th Cir. 1979), which was praised by the Eighth Circuit as "a model of clarity, which should serve as an example for the proper computation of attorney's fees awards in cases of this type." 594 F.2d at 642. *See also, Fulbright v. Brown Group, Inc.*, 493 F.Supp. 914 (E.D. Mo.1980).

*Johnson, supra*, set forth twelve factors to be considered in an award of attorney's fees: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill required to perform the legal services properly; (4) the preclusion of other employment; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client, and (12) awards in other cases.

In this case, plaintiff's attorney is claiming fees for approximately four hundred and fifty hours (212.20 hours for himself; 5.60 hours for an associate; 226.15 hours for a paralegal). The Court finds that this figure is unreasonable and is not justified by the record and does not accu-

rately reflect the time and labor required to perform the services plaintiff's counsel actually performed. Very little discovery was engaged in. Plaintiff's counsel made no attempt to interview any of defendant's witnesses. He took no depositions and failed to attend a deposition taken by defendant. Very little legal research was performed. Plaintiff's counsel failed to prepare a trial brief in direct opposition to the Court order of May 7, 1980, directing the parties to submit trial briefs prior to trial. These and other considerations convince this court that plaintiff's counsel's estimate of the number of hours required is unreasonable. This Court finds that one hundred (100) hours were reasonably spent in the trial preparation of this case.

Plaintiff's attorney has represented to the Court that his customary fee is ninety dollars ($90.00) per hour, but the Court finds that a reasonable hourly fee in this case is fifty dollars ($50.00) per hour. The following factors have been considered in reaching this conclusion: the novelty and difficulty of the questions; the skill required to perform the legal services properly; the contingent nature of the fee; the amount involved and the results obtained; the experience, reputation and ability of the attorney; and the nature and length of the professional relationship with the client.

Because of the marked discrepancy between plaintiff's counsel's customary fee and the fee set by the Court, further elaboration is necessary. When the Court considers the experience and ability of an attorney, it must also consider the diligence of the attorney in getting his client's case to trial and also the adequacy of the representation actually given.

Discovery had closed in this case for one year before plaintiff's attorney requested that it be reopened. At that time, the Court generously allowed an extra one hundred and twenty (120) days for further discovery, at the end of which time trial was scheduled. Plaintiff's attorney then moved for a continuance of trial because he had not completed discovery in a case which was nearly three years old.

As far as adequacy of representation is concerned, there are two glaring instances in this case where representation was not only inadequate but non-existent. Prior to trial, defendant scheduled the deposition of Mrs. Margo DeVitt, the passenger who wrote the complaint letter against plaintiff which resulted in her termination. Plaintiff's attorney declined to attend. This deposition was perhaps the most crucial phase in plaintiff's case, yet her attorney waived plaintiff's right to cross-examination because, as he explained to the Court, he did not want to listen to that woman's self-serving statements. The other instance of inadequate representation was plaintiff's attorney's failure to submit a trial brief, even though the Court had ordered trial briefs in its order dated May 7, 1980. Plaintiff's attorney chose to interpret this order as "discretionary" and allowed the Court to proceed to trial with only the defendant's view of the applicable law to guide it.

In light of these circumstances, the Court finds that an award of attorney's fees in the amount of $5,000 is reasonable.

For the reasons stated, it is hereby

ORDERED that judgment is entered in favor of plaintiff and against defendant on all counts, and plaintiff is to be immediately reinstated with full seniority benefits, and paid damages in the amount of $1,912.90. It is further

ORDERED that plaintiff is awarded two (2) trip passes in kind on a stand-by basis, to be taken within one year from the date of her reinstatement. It is further

ORDERED that plaintiff's attorney is awarded $5,000 as reasonable attorney's fees. Costs will be assessed against defendant.