Ethelene P. McGRUDER, Plaintiff,

v.

Anthony M. FRANK,[1] Postmaster
General, United States Postal
Service, Defendant.

C–3–90–353.

United States District Court,
S.D. Ohio, W.D.
at Dayton.

May 12, 1992.

1. Mr. Frank is sued herein in his official capacity. Having resigned from office, he is replaced as party Defendant by Mr. Runyon, his successor as Postmaster General, pursuant to Fed.R.Civ.P. 25(d). In accordance with standard practice in this Court, the caption will not be amended.

Walter Reynolds, Dayton, OH, for plaintiff.

Gregory Lockhart and Ralph Kohnen, Office of U.S. Atty., Robert Sawicki, Asst. U.S. Atty., Dayton, OH, for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND DECISION

MERZ, United States Magistrate Judge.

This is an action by Plaintiff Ethelene P. McGruder alleging race and sex discrimination in her removal from employment with

the United States Postal Service. She had originally also claimed handicap discrimination under federal law and assault, battery, and false imprisonment under Ohio common law; the handicap discrimination claim was dismissed on summary judgment and the pendent claims were dismissed voluntarily under Fed.R.Civ.P. 41(a).

The parties unanimously consented to plenary magistrate judge authority under 28 U.S.C. § 636(c) and the case was tried to the Court, sitting without a jury, for three days, May 7–9, 1992.

The Court's findings of fact and conclusions of law as required by Fed.R.Civ.P. 52 are as follows.

## FINDINGS OF FACT

1. Ethelene P. McGruder, a black female, commenced her employment with the United States Postal Service ("Postal Service") on or about January 31, 1966, and was employed by it until December 4, 1989, a period just short of twenty-four years. Prior to August, 1989, plaintiff was employed as the Express Mail Coordinator at the Postal Service's Express Mail Office at its Air Mail facility ("AMF") at the Dayton Airport under the supervision of Albert Livesay, a Caucasian male. Ms. McGruder is a citizen of the United States and a resident of Dayton, Ohio.

2. During the summer of 1989, Ms. McGruder developed some situational stress illness apparently at least in part related to her job, and took sick leave at her doctor's insistence. When she returned to work on or about August 9, 1989, she was reassigned from her position as the Express Mail Coordinator to mail processing at the central post office in downtown Dayton, a less stressful position at the same pay grade.

3. Also at the time she returned to work, Ms. McGruder received a Letter of Warning dated August 3, 1989. The Postal Service has a progressive disciplinary system. A Letter of Warning is a specific disciplinary step in the Postal Service, more severe than a "discussion," but less severe than a suspension or a removal. Ms. McGruder filed an appeal of the August 3, 1989, Letter of Warn-

ing and, on September 29, 1989, obtained consent from Mr. Kenneth C. Hartweck, a Caucasian male and Management Sectional Center ("MSC") Director of Human Resources, to return to the Express Mail Office to review documents related to some of the particular deficiencies (allegedly false entries on five Express Mail labels) in processing Express Mail alleged in the Letter of Warning. It is unclear whether Mr. Hartweck wanted Ms. McGruder to bring the originals to him or merely obtain copies of the documents. However, in Ms. McGruder's presence, he telephoned Edward Duell, the then-Acting Express Mail Coordinator, to say that Ms. McGruder would be coming into the facility to search for the documents.

4. On October 2, 1989, Ms. McGruder returned to the Express Mail Office. She was given the opportunity by the Acting Express Mail Coordinator, Edward Duell, a Caucasian male, to review the files in order to find the documents she was seeking. Initially she sought files from 1986 and 1987, but Mr. Duell told her that these files had been purged. He testified that the purging was done before September 29, 1989, under ordinary Postal Service records retention policies, and there was no evidence to contradict that testimony. Ms. McGruder found some similar documents among the 1988 files which proved her point sufficiently.

5. Mr. Duell was concerned about the appropriate method of handling the documents and sought advice from various supervisors. He was unable to reach his direct supervisor, Mr. Al Livesay, or Mr. Hartweck. He received advice from Ms. Sandra Savoie in Employee and Labor Relations that his concern for original documents in his custody was appropriate and that he should either himself send the originals to Mr. Hartweck or make copies.

6. Ms. McGruder refused to accept Mr. Duell's position and attempted to leave the Express Mail Office with some original documents in hand. Mr. Duell initially attempted to keep her from leaving while calling Mr. Hartweck's office. Unable to reach Mr. Hartweck, he snatched the documents from Plaintiff's hand. The testimony is in conflict whether Mr. Duell had to reach around her

body from both sides and remove the papers from behind her, touching her body thereby (Ms. McGruder's version) or whether he reached around one side (Mr. Duell's version). There were no witnesses except the two persons involved. The Court is unable to resolve the conflict in their testimony by any circumstantial evidence or by relying on the slightly different version Ms. McGruder told Ms. Savoie the next day. The Court finds resolution of the conflict unnecessary to its decision. Mr. Duell acted at all times within the scope of his employment.

7. After Mr. Duell took the documents from Ms. McGruder, he started to leave the office, turning his back to Ms. McGruder, whereupon she struck him forcibly one time on the head with her umbrella before they had both left the Express Mail Office.

8. Once they were outside the Express Mail Office and onto the work room floor, John Hamilton, Express Mail Clerk, a Caucasian male, witnessed Ms. McGruder with her umbrella raised to strike Mr. Duell and reported the incident to Tour III Supervisor Al Glaze, a Caucasian male, who called security.

9. When Mr. Glaze arrived at the scene he observed Mr. Duell shielding his head as if he had been struck and Ms. McGruder with her umbrella poised in a striking position. He noticed that Mr. Duell's right ear was red and that his hair was in disarray. He called security to have plaintiff removed from the premises. While they were waiting to have security officials escort plaintiff from the premises Mr. Duell and Mr. Glaze attempted to use a copying machine to reproduce the documents that he was holding, but Ms. McGruder put her hand on the copying machine thus preventing him from copying the documents. At trial Ms. McGruder explained that she didn't think management, having made the charges in the Letter of Warning, should be allowed to gather more evidence to support them.

10. Dr. Jack L. Colglazier, M.D., the Postal Service physician, examined Mr. Duell on October 4, 1989, and observed that Mr. Duell had a "small, tender swollen area in the right temple scalp, area of his scalp." He stated that it appeared there had been an injury to Mr. Duell's body in this area because "there was a swollen area which did not appear to be due to any infection or other type of condition." (Joint Exhibit 1, p. 228–29, hereinafter "JX").

11. Interviewed by Labor Relations Assistant Sandra Savoie, on October 3, 1989, Ms. McGruder stated that she could not remember whether she hit Mr. Duell. In a written statement made on the same date to Mr. Williams of the Postal Service, Ms. McGruder did not deny striking Mr. Duell. (JX 2, pp. 313–316). It was the usual practice of the Postal Service at Dayton to remove employees accused of assault on an emergency basis until the investigation had been completed. In Ms. McGruder's case, Ms. Savoie concluded she was not a risk of violence to herself or others, particularly since she was not then stationed at the Air Mail Facility, and permitted her to return to work. This decision provoked a grievance from the Postal Workers Union, who thought she should have been removed immediately.

12. On October 11, 1989, Ms. McGruder was issued a notice, by Mr. Hartweck, proposing to remove her from postal employment for striking Mr. Duell with an umbrella. (JX 1, pp. 8–9). In the Proposed Notice of Removal, he expressly mentioned Ms. McGruder's failure to deny the striking, her responsibility as a supervisor to enforce the rules and regulations of the Postal Service, and a prior Letter of Warning she had been issued on July 22, 1988, for failing to follow instructions and unsatisfactory work performance. (Id.) The August 3, 1989, Letter of Warning as to which she had been gathering evidence was not mentioned and apparently played no role in the decision to propose removal.

13. Ms. McGruder obtained the assistance of counsel and responded to the notice in person as well as in writing. (JX 1, pp. 10–15). On December 1, 1989, after consideration of the response to the notice, Clarence E. LupPlace, a Caucasian male and Acting MSC Manager/Postmaster of the Dayton, Ohio, Post Office, issued a letter of decision finding the charges as stated in the October 11, 1989, notice to be fully supported

by the evidence, warranting plaintiff's removal. (JX 1, pp. 16–18).

14. On appeal to the Merit Systems Protection Board, Administrative Law Judge Stephen P. Manrose affirmed the removal action (JX 1, pp. 239–252). He found that Ms. McGruder had not sustained her allegations of handicap, race, and sex discrimination and that removal was an appropriate penalty in view of the seriousness of the conduct, the notice she had been given as to the agency's view of such conduct, her lack of remorse, and her failure to accept responsibility for her conduct. (JX 1, pp. 248–249). Judge Manrose's Initial Decision became final on May 17, 1990, since Ms. McGruder chose not to file a petition for review with the MSPB.

15. Ms. McGruder did, however, choose to appeal the MSPB findings on discrimination to the Equal Employment Opportunity Commission ("EEOC"). The EEOC on August 31, 1990, issued a decision concurring with the final decision of the MSPB.

16. Mr. Hartweck originally issued a Letter of Warning to Mr. Duell for his role in the incident of October 2, 1989. Mr. Duell appealed and the Letter was rescinded by Mr. LupPlace, who concluded that Mr. Duell had acted in accordance with the advice he had received from Employee and Labor Relations.

17. Plaintiff presented extensive evidence relating to disciplinary actions taken with respect to other incidents which Plaintiff characterized as involving assaultive behavior. Defendant strongly objects to the relevance of these other incidents on the grounds they involved decisionmakers other than Messrs. Hartweck and LupPlace. Apart from the question of whether these incidents are relevant, the testimony establishes the following facts with respect to the incidents, which are summarized in PX 23 and 24:

1. **Lawrence Gootee.** Mr. Gootee, a Caucasian male, was first employed by the Postal Service in February, 1976. He is a twice-wounded veteran of the Vietnam War and has a forty percent disability rating. On October 2, 1986, he was the supervisor of Jim Davis. Davis entered the Swing (break) Room where Gootee was eating and slammed a can of food down on the table. According to Gootee's unrefuted testimony, he had previously told Davis that he suffered from Post–Vietnam Stress Syndrome and was badly upset by sudden loud noises, but Davis continued to joke about the matter. On this occasion, he confronted Davis, said, "I'm serious, motherfucker," and struck the unlit cigar from Davis's mouth.[2] As a result of investigation, Mr. Gootee was immediately placed off duty by Antonio Daltabuit and remained off duty for about five months. Mr. Daltabuit, a Caucasian male, proposed Mr. Gootee's removal from the Postal Service (PX 16, Letter of October 31, 1986). On appeal, Mr. Gootee submitted evidence regarding Post–Vietnam Stress Syndrome and entered an Employee Assistance Program; he had apologized to Davis (and Davis to him) within minutes of the incident. On that basis, the case was settled while pending on appeal to the MSPB with Mr. Gootee's reduction in grade to rural letter carrier and a long-term suspension without pay.

In November, 1990, Mr. Gootee was again proposed to be removed from the Postal Service for a confrontation with a customer, John Steinle, during which, the customer alleged, Mr. Gootee called him "stupid" and threatened to "kick his ass." While the proposed removal was pending arbitration, Mr. Steinle refused to testify and Ms. Savoie settled the grievance by reducing it to a long-term suspension (16 days—anything over 14 days being "long-term") without pay.

2. **Raymond Randall.** Raymond Randall is a Caucasian male deaf mute bargaining unit employee of the Postal Service. In October, 1986, and again in October, 1989, he was disciplined for bodily contact with co-worker Craig Collins. Testimony established that Mr. Randall cannot communicate orally and must frequently touch other employees to get their attention in order to communicate with them. Apparently Mr. Collins was

---

2. Bruce Stemple, an eyewitness, testified Gootee struck Davis in the head. The record shows Stemple's animosity to Gootee and the investigators for the Postal Service did not find the facts to be as Stemple testified. The Court finds Stemple's characterization not credible.

particularly sensitive to being touched by another man. In 1986 the proposed seven day suspension of Mr. Randall was reduced to a "discussion," the lowest form of discipline; in 1989, he received a fourteen-day record suspension, but served only seven days. The adjudicating officials sincerely believed that these were not attempts by Mr. Randall to inflict injury on Mr. Collins, but to get his attention.

3. **Donald Dohrman.** Mr. Dohrman is a Caucasian male who was placed on emergency off-duty status in August, 1987, for allegedly assaulting his supervisor, Trellis Grubbs. On September 8, 1987, he was returned to duty with a fourteen day suspension in settlement of his union grievance between James Dixon and Thomas Smyzek (PX 12). During investigation, Mr. Dixon determined from the eyewitness testimony of another supervisor that the bodily contact between Dohrman and Grubbs occurred because Dohrman was following Grubbs closely and Grubbs stopped suddenly. Dohrman did not deny threats of violence allegedly made during the confrontation.

4. **Boyde Marr.** Mr. Marr is a black male who was removed from his supervisory position with the Postal Service for hitting General Supervisor George Mance in the face with a manila folder and threatening him physically.[3] Since the removal was upheld, there was virtually no testimony about it in this case.

5. **Robert Ackley.** Robert Ackley is a Caucasian male bargaining unit employee who was proposed to be removed in 1988 for throwing a tray which struck one postal employee and almost struck another. The discipline was reduced to a seven day suspension because it was found that throwing trays when emptied was a common occurrence in this particular location and there did not appear to be an intent to injure.

6. **Walter Curtis.** Walter Curtis is a black male supervisor who was removed from the Postal Service for striking a subordinate employee. Because his removal was upheld

there was, as with Mr. Marr, no testimony regarding the circumstances of his removal.

7. **Kenneth Thacker.** Kenneth Thacker is a Caucasian male who was proposed to be removed for striking fellow employee Joy Clay with a ring knife, snatching her head phones, and threatening her with physical violence. Ms. Clay was a casual employee who refused to testify against Mr. Thacker at the arbitration stage and his grievance was settled by permitting him to return to work after a seven month suspension without pay.

8. **David Williams.** David Williams is a black male Postal Service employee in the bargaining unit at the Lima post office. He was proposed to be removed for offering to fight with R. Conrad, hitting Marsha Lee in the back, knocking Barbara Killian off balance, and making unsolicited and unwelcome sexual remarks to Ms. Killian. Thaddeus Paskiewicz, the Lima Postmaster, settled the union's grievances on behalf of Mr. Williams by reducing the discipline to a three-month suspension without pay when he determined that the incidents were caused by intoxication and Mr. Williams entered the Employee Assistance Program.

9. **Guy LeValley.** Mr. LeValley was issued a fourteen-day suspension for bodily contact with Joyce Staples and Cathy Yates which was determined to be sexual harassment. Xenia Postmaster Joyce Clay–Sanders, a black female, settled the union's grievance on Mr. LeValley's behalf by letting the suspension stand, but without any loss of pay. She noted that Mr. LeValley had no prior discipline of any kind and seemed to come to an understanding of this serious problem as a result of what happened; he took sexual harassment counseling to avoid any repetition.

10. **Mark Donaldson.** Mark Donaldson, a black male bargaining unit employee, was proposed to be removed for grabbing Tamara Thompson, a white female co-worker with whom he had had a "relationship" of undisclosed intimacy. The union's grievance

---

3. Litigation apparently involving this incident, *Marr v. Dixon*, C–3–91–461, is currently pending in this Court before the undersigned. The findings of fact made in this paragraph are without any participation on Mr. Marr's part and are not entitled to any *res judicata* effect in that litigation.

on behalf of Mr. Donaldson was settled by reducing the disciplien to a seventeen-day suspension.

**11. Marcus Rocquemore and Sandra Hoke.** Ms. Hoke and Mr. Rocquemore were cohabiting co-workers when, on September 24, 1990, Ms. Hoke slapped Mr. Rocquemore in the face on the job. Mr. Rocquemore responded by grabbing her in the shoulders hard enough to cause bruising. Both were proposed for removal and the discipline was reduced to a twenty-two-day suspension when neither one wanted to testify against the other. Mr. Rocquemore is a black male. The settling official, Ms. Savoie, testified she could not tell from appearances whether Ms. Hoke is a light-skinned black female or a dark-skinned Caucasian female.

**12. Ken Wright and Chris Diekman.** Messrs. Wright and Diekman, Caucasian male bargaining unit employees, were proposed to be removed for fighting with one another on January 26, 1991. Mr. Diekman did not oppose his removal and it became final. Mr. Wright's removal was reversed upon appeal to arbitration.

**13. T. Gray.** Mr. Gray is a black male who was issued a fourteen-day suspension in May, 1991, for several incidents of sexual harassment, some of which involved unconsented touchings. Mr. Dixon settled the resulting grievance with Union President John Smith (PX 13) by reducing the discipline to a "discussion." Since Mr. Gray had had an automobile or other personal injury accident, he was permitted to convert the appropriate amount of time off to sick leave or leave without pay.

18. Plaintiff's argument with respect to these other cases is that they show inconsistent discipline applied to assaultive behavior and that the net effect of the discipline over the sixteen incidents summarized in PX 23 is that the only persons finally removed who contested their removal were two black males and one black female, the Plaintiff.

Defendant responds that it is not required to be consistent in its discipline so long as the inconsistencies are not motivated by race or sex discrimination and that no inference of intentional discrimination can be found from the inconsistencies pointed out by Plaintiff when many different decisionmakers were involved.

Plaintiff replies that the decisionmakers in Ms. McGruder's case had all of these disciplinary files available to them and that the Court could infer intentional discrimination from their failure to make sure that the discipline was consistent.

19. The Postal Service called a number of supervisory personnel who are or have been in a position to recommend discipline of Postal Service employees. Their uniform testimony was that assault, along with theft, are generally regarded as removable offenses within the Postal Service. While there is no written "table of penalties" prescribing penalties for particular workplace offenses, the pattern of decision by arbitrators and the Merit Systems Protection Board indicates what kinds of discipline will be upheld for what kinds of offenses.

While there is no written policy of the Postal Service requiring removal for "assault," the Court finds that the actual practice of the Postal Service reflected in these cases is quite consistent. In virtually every case where there was initial evidence of assault of the sort likely or intended to inflict bodily injury, the proposed discipline was removal:

Mr. Randall's case is not an assault of this type, but an attempt to communicate with body language what he could not communicate verbally.

The LeValley and Gray cases, where suspension rather than removal was the initially proposed discipline, are incidents of sexual harassment rather than assault with intent to inflict bodily injury. Whether it is appropriate to treat sexual harassment involving actual touching as less serious than assault with intent to inflict bodily injury is not for this Court to decide in this case. Making that distinction is certainly not irrational, nor does making the distinction support an inference of racial discrimination.

The Donaldson and Rocquemore–Hoke incidents are cases of true interpersonal violence but between persons involved in "relationships" with each other. Even in these

cases, the initial proposed discipline was removal. Unfortunately in our society domestic violence is probably the most prevalent form of interpersonal violence, including violence between persons not legally married but involved in relationships which have some of the same incidents of marriage. At least with respect to the Rocquemore–Hoke matter, the disciplinary official was faced with the same problem so frequently facing prosecutors of domestic violence: neither party was willing to testify against the other. In both cases the settlement agreed upon was based on rational considerations from which neither race or sex discrimination can be inferred.

Based on the testimony, the Ackley and Dohrman matters appear to involve negligent rather than intentional injury. Removal was initially proposed, but Postal Service management settled for less when it was shown that intentional injury was not involved.

In the Ken Wright matter, the decision to remove was pursued vigorously by Postal Service management, but overturned by an outside arbitrator; even if the Court were to assume for the sake of argument (and there is no evidence to this effect) that arbitrator's intent was to discriminate in favor of Mr. Wright because he is white, there would be no reason to impute that intent to the Postal Service.

The Lawrence Gootee incidents present the most difficult comparison with Ms. McGruder's case because Mr. Gootee was given two second chances and Ms. McGruder none. The significant difference between the two cases is that Mr. Gootee is a disabled veteran with a recognized serious psychological consequence of service in Vietnam. Given the national policy to hire disabled veterans and the handicapped generally, the Court does not infer any intentional racial or sexual discrimination from the different treatment received by Ms. McGruder and Mr. Gootee, especially in light of the fact that the second incident did not involve any actual violence and the witness was unwilling to testify.

20. Plaintiff stressed that the only persons actually removed from the Postal Service (aside from Mr. Diekman, who did not contest his removal) are black. The testimony also established that all of them, Ms. McGruder, Mr. Marr, and Mr. Curtis, were supervisory employees. The Postal Service could appropriately expect, as testimony established it did, a higher standard of behavior from supervisors. Also, supervisors are not members of the bargaining unit and do not have the collective bargaining agreement grievance process available to them. In several instances of bargaining unit employees where removal was initially proposed but lesser discipline was eventually accepted, the exigencies of the grievance/arbitration process clearly influenced the decision to settle.

21. Ms. McGruder also emphasized the difference in treatment between herself and Mr. Duell. While from Ms. McGruder's perspective Mr. Duell's behavior toward her (preventing her from leaving the Express Mail Office and forcibly taking the documents from her) may be as serious as her hitting him several times with her umbrella, the Postal Service was not required to adopt Ms. McGruder's perspective. No one saw Mr. Duell "assault" Ms. McGruder (i.e., reach around her from both sides to take the documents, touching her breasts and derriere with parts of his body in the process) and there were no physical observable results, while Dr. Colglazier confirmed Mr. Duell's injury and both Mr. Glaze and Mr. Hamilton saw Ms. McGruder raise her umbrella to strike Mr. Duell and even Ms. McGruder admits that both of them said to her, "Don't hit him again."

22. The ultimate difference in treatment between Mr. Gootee and Ms. McGruder is troubling in the same way that sentencing disparity is always troubling. To do justice as between those two cases, it would not have been inappropriate to discipline Ms. McGruder with a long-term suspension and a reduction in grade, instead of a termination. But as noted above, there are significant differences between the cases (Mr. Gootee's remorse and immediate apology and the medical basis for his problem) and the Postal Service is not required by Title VII to be absolutely consistent in its discipline. The Court is not persuaded that racial or sexual discrimination played any part in this difference in treatment.

23. The only other female in the sample, Sandra Hoke, was not removed, although her removal was proposed. The record reflects no determination of whether she is Caucasian or African–American; Ms. Savoie could not tell from her appearance. The record does not establish that she was treated more harshly than males. Indeed, she was treated precisely the same as Mr. Rocquemore, and she was the initiator of the violence. Certainly her case does not help establish any sex discrimination.

## CONCLUSIONS OF LAW

■ 1. 5 U.S.C. § 7703(b)(2) permits judicial review of MSPB decisions in federal district court in "mixed" cases where the plaintiff alleges discrimination. Although the district court conducts de novo review, prior administrative findings made with regard to the discrimination claim may be admitted as evidence. 5 U.S.C. § 7703(c)(3); *Chandler v. Roudebush,* 425 U.S. 840, 863 n. 39, 96 S.Ct. 1949, 1960 n. 39, 48 L.Ed.2d 416 (1976). There was no objection here to admission of the MSPB determination and the evidence before the MSPB.

■ 2. Cases brought pursuant to 5 U.S.C. § 7703(b)(2) are subject to the provisions of Section 717(c) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–16(c). Title VII represents the exclusive remedy for claims of employment discrimination in the federal work place based upon race or sex. *Brown v. General Services Administration,* 425 U.S. 820, 832–34, 96 S.Ct. 1961, 1967–69, 48 L.Ed.2d 402 (1976).

■■ 3. The essential factual inquiry in a case of alleged employment discrimination under Title VII is "whether the defendant intentionally discriminated against the plaintiff." *United States Postal Service Board of Governors v. Aikens,* 460 U.S. 711, 715, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983); "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981).

■ 4. The parties have understood and tried this case as a "disparate treatment" case (Final Pretrial Order, Doc. # 32, p. 2). In a "disparate treatment" employment discrimination case, proof of discriminatory motive is an essential element of the plaintiff's proof. *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977). The plaintiff thus must prove (1) differences in treatment, and (2) a discriminatory motive on the part of the employer. *Beaven v. Commonwealth of Kentucky,* 783 F.2d 672 (6th Cir.1986).

5. The general rules governing the order and allocation of proof in an individual, non-class action alleging that an employment decision was discriminatory are set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 800–02, 93 S.Ct. 1817, 1823–24, 36 L.Ed.2d 668 (1973).

■ 6. The *McDonnell Douglas* analytical framework is to be used in a disparate treatment case. *Galbraith v. Northern Telecom, Inc.,* 944 F.2d 275, 279 (6th Cir.1991). To establish a prima facie case of disparate treatment, Ms. McGruder is required to show 1) that she is female and a member of a racial minority, 2) that a similarly situated white or male received dissimilar (better) treatment, in this case discipline, and 3) that sufficient evidence exists from which the Court can find a causal connection between race or sex and the dissimilar treatment. *Cooper v. City of North Olmsted,* 795 F.2d 1265, 1270 (6th Cir.1986).

■ 7. Where a plaintiff alleges disparate treatment, courts " 'require indirect evidence from which an inference of discriminatory motive may be drawn, namely comparative evidence demonstrating that the treatment of plaintiff differs from that accorded to otherwise "similarly situated" individuals who are not within the plaintiff's protected group'." *Shah v. General Electric Co.,* 816 F.2d 264, 268 (6th Cir.1987) (quoting B. Schlei & P. Grossman, *Employment Discrimination Law,* at 1291 (2d ed. 1983). It is the plaintiff's burden to establish a similarity between his conduct and the conduct of other employees outside her protected class who she

claims were treated differently. *Beaven,* 783 F.2d at 625–76.

8. Where a plaintiff alleges that employees outside of her protected class were treated differently, the difference in treatment is probative of discrimination only if the employees were so similarly situated to the plaintiff that the most likely reason for treating the plaintiff differently was her race or sex. *See, Furnco Construction Co. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978). If nondiscriminatory explanations will account for the differences in treatment as readily as plaintiff's race or sex, she has not shown that the most probable explanation is her race or sex. *See, Texas Dept. of Community Affairs,* 450 U.S. at 258, 101 S.Ct. at 1096 ("[I]t is the plaintiff's task to demonstrate that similarly situated employees were not treated equally.")

> Employees are not 'similarly situated' merely because their conduct might be analogized. Rather, in order to be similarly situated, other employees must have been subjected to the same standards governing performance evaluation and discipline, and must have engaged in conduct similar to the plaintiff's without such differentiating or mitigating circumstances that would distinguish their conduct or the appropriate discipline of it.

*Mazzella v. RCA Global Communications, Inc.,* 642 F.Supp. 1531 (S.D.N.Y.1986), *aff'd without op.,* 814 F.2d 653 (2d Cir.1987).

9. For example, a different supervisor can suggest a basis other than sex or race for the difference in treatment received by two employees. *Cooper v. City of North Olmsted,* 795 F.2d 1265, 1271 (6th Cir.1986). *See also, Jones v. Gerwens,* 874 F.2d 1534, 1541 (11th Cir.1989); *Tate v. Weyerhaeuser Co.,* 723 F.2d 598, 606 (8th Cir.1983) (different disciplinary measures distinguished because different supervisory personnel were involved); *Thomas v. Florida Power & Light Co.,* 47 FEP Cases 821, 828, 1988 WL 142151 (S.D.Fla.1988) (plaintiff not similarly situated to comparative employee because they had different supervisors and worked at different facilities); *Lynch v. Dean,* 39 FEP Cases 338, 345, 1985 WL 56683 (M.D.Tenn.1985) *rev'd on other grounds,* 817 F.2d 380 (6th Cir.1987) (proof that plaintiff was disciplined more severely than workers under supervision of another foreman did not aid plaintiff in showing she was victim of discrimination); *Talley v. U.S. Postal Service,* 33 FEP Cases 233, 238 (E.D.Mo.1982), *aff'd,* 720 F.2d 505 (8th Cir.1983), *cert. denied,* 466 U.S. 952, 104 S.Ct. 2155, 80 L.Ed.2d 541 (1984) (none of employees worked for plaintiff's supervisor, whose motivation was at issue; therefore, employees to whom plaintiff compared herself were not similarly situated); *Williams v. TWA, Inc.,* 507 F.Supp. 293 (W.D.Mo.1980), *aff'd in part rev'd in part,* 660 F.2d 1267 (8th Cir.1981) (evidence of disparate treatment of little probative value where disciplinary measures were imposed by different supervisors at different domiciles).

10. If the plaintiff succeeds in establishing a prima facie case, an inference or a rebuttable presumption of discrimination is created and the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell Douglas Corp.,* 411 U.S. at 802, 93 S.Ct. at 1824; *Texas Dept. of Community Affairs,* 450 U.S. at 253, 101 S.Ct. at 1093.

11. The defendant can rebut the presumption of discrimination by producing some "admissible evidence which would allow the [court] rationally to conclude that the employment decision had not been motivated by discriminatory animus." *Texas Dept. of Community Affairs,* 450 U.S. at 257, 101 S.Ct. at 1095. The defendant does not have the burden of persuading the court that it was actually motivated by the proffered nondiscriminatory reasons. *Board of Trustees of Keene State College v. Sweeney,* 439 U.S. 24, 25, 99 S.Ct. 295, 295, 58 L.Ed.2d 216 (1978). The defendant must only demonstrate that a genuine issue of fact is raised by the evidence as to the reason for the employment decision in order to meet its burden of going forward. *Texas Dept. of Community Affairs,* 450 U.S. at 254–55, 101 S.Ct. at 1094.

12. The defendant has no obligation to prove by a preponderance of the evidence the existence of nondiscriminatory reasons for its decision. Rather, a plaintiff's prima

facie case of discrimination will be rebutted if the employer simply articulates—not proves—a legitimate, nondiscriminatory reason for its action. *Texas Dept. of Community Affairs,* 450 U.S. at 257–58, 101 S.Ct. at 1095–96.

13. If the defendant meets its burden of going forward, the plaintiff then has the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. *McDonnell Douglas Corp.,* 411 U.S. at 804, 93 S.Ct. at 1825; *Simpson v. Diversitech General, Inc.,* 945 F.2d 156, 158–59 (6th Cir. 1991); *Sims v. Cleland,* 813 F.2d 790, 792 (6th Cir.1987).

14. The plaintiff may establish that the reasons stated are pretextual "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Texas Dept. of Community Affairs,* 450 U.S. at 256, 101 S.Ct. at 1095.

15. Title VII was not intended to "diminish traditional management prerogatives." *Steelworkers v. Weber,* 443 U.S. 193, 207, 99 S.Ct. 2721, 2729, 61 L.Ed.2d 480 (1979); *Wrenn v. Gould,* 808 F.2d 493, 502 (6th Cir.1987). It does not require the employer to restructure its employment practices to maximize the number of minorities and women hired or retained. *Furnco Construction Corp.,* 438 U.S. 567, 577–78, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978), cited in *Texas Dept. of Community Affairs,* 450 U.S. at 259, 101 S.Ct. at 2096.

16. Federal courts are not the appropriate forum in which to review the multitude of personnel decisions that are made daily by public agencies, *Bishop v. Wood,* 426 U.S. 341, 349, 96 S.Ct. 2074, 2079, 48 L.Ed.2d 684 (1976), and federal statutes prohibiting discrimination are not "intended as the vehicle for general judicial review of business decisions." *Douglas v. Anderson,* 656 F.2d 528 (9th Cir.1981). Indeed, persons in Plaintiff's position have been granted such a forum in the Merit Systems Protection Board.

17. Title VII does not take away an employer's right to interpret its rules as it chooses, and to make determinations as it sees fit under those rules. "Title VII addresses discrimination." *Ferguson v. Veterans Administration,* 723 F.2d 871 (11th Cir.), *cert. denied,* 469 U.S. 1072, 105 S.Ct. 563, 83 L.Ed.2d 504 (1984). "Title VII is not a shield against harsh treatment of the workplace." *Jackson v. City of Killeen,* 654 F.2d 1181, 1186 (5th Cir.1981).

18. The issue in a discrimination case is not whether the basis on which the employer acted in taking a personnel action is "sound"; rather, the issue is whether the reasons articulated by the employer are a pretext for discrimination. *In re Lewis,* 845 F.2d 624, 633 (6th Cir.1988) (emphasis in original). *See also, Nix v. WLCY Radio,* 738 F.2d 1181, 1187, *reh'g denied (en banc),* 747 F.2d 710 (11th Cir.1984) ("Title VII does not require the employer to have good cause for its decisions. An employer may [refuse to promote a person] for a good reason, a bad reason, a reason based on erroneous facts or for no reason at all, as long as its action is not for a discriminatory reason.").

Applying these conclusions of law to the facts found above, the Court determines that the Postal Service did not intentionally discriminate against Ms. McGruder on the basis of her race or sex when it removed her.

Accordingly, judgment will be entered in favor of the Defendant and against the Plaintiff, dismissing the Complaint herein with prejudice.