452 S.E.2d 436

**MILDRED L.M., Plaintiff Below, Appellant,**

v.

**JOHN O.F., Defendant Below, Appellee.**

No. 22037.

Supreme Court of Appeals of West Virginia.

Submitted Oct. 4, 1994.

Decided Dec. 8, 1994.

Ellen A. Archibald, Asst. Atty. Gen., Charleston, Matthew E. Bieniek, Child Advocate Office, Martinsburg, for appellant.

Robert R. Skinner, Charles Town, for appellee.

CLECKLEY, Justice:

Mildred L.M.,[1] the appellant and plaintiff below, appeals an order of the Circuit Court of Jefferson County, which denied her motion for judgment notwithstanding the verdict or, in the alternative, for a new trial. In this paternity action, the jury returned a verdict for the appellee and defendant below, John O.F. The plaintiff contends that the evidence at trial preponderated against the verdict. We agree with the plaintiff's argument, and we reverse the order of the circuit court.

I.

The plaintiff was unmarried when she gave birth to her son, Daniel E.M., on July 28, 1988. As a recipient of public assistance, she was required to file information that could be used to pursue the absent father of her child. Accordingly, a Uniform Reciprocal Enforcement of Support Act (URESA) petition was filed against the defendant. He denied paternity.

The first trial held on June 22, 1992, resulted in a hung jury. A second trial was held on December 22, 1992. The sole issue was the paternity of Daniel.

At the second trial, the plaintiff testified and called Dr. Norman Kramer[2] who explained the paternity blood testing results. The evidence showed that the plaintiff became pregnant while taking birth control pills, but her prescription had been recently changed. She testified that she engaged in sexual relations with Robert C. in July of 1987. She abstained from having sex until she had sexual relations with the defendant in November of 1987. Their relationship lasted approximately three weeks. On or about December 7, 1987, she resumed sexual relations with Robert C.

The plaintiff learned of her pregnancy in December of 1987. She originally believed that Robert C. was the father of the child. However, after she received the results of a sonogram performed on January 12, 1988, she realized that Robert C. could not be the father because they had not engaged in sexual relations during the estimated time of conception. She stated that the only other man that could be the father of her son was the defendant. Human Leucocyte Antigens (HLA blood-tissue)[3] group test results re-

---

1. We follow our traditional practice in cases which involve sensitive facts and do not use the last names of the parties so as not to stigmatize them or their children. *See, e.g., Nancy Viola R. v. Randolph W.*, 177 W.Va. 710, 356 S.E.2d 464 (1987); *West Virginia Dept. of Human Services v. La Rea Ann C.L.*, 175 W.Va. 330, 332 S.E.2d 632 (1985).

2. Dr. Kramer is the Immunogenetics Director of the Immunogenetics and Immunohematology Laboratory, National Center for Forensic Science, in Baltimore, Maryland. He conducted the testing in this case.

3. HLA testing "involves tissue typing of white cell blood groups." *Turek v. Hardy*, 312 Pa.Su-

per. 158, 159, 458 A.2d 562, 563 (1983). HLA test results can be used to exclude a putative father and to calculate the probability that a putative father is the actual father. *See Commonwealth v. Khamphouseane*, 434 Pa.Super. 93, 642 A.2d 490, 492 (1994) (court explains how these tests operate—both as an exclusion procedure and an inclusion procedure). *See also Olson v. Dietz*, 347 Pa.Super. 1, 4–5, 500 A.2d 125, 126–127 (1985); Case Comment, *Human Leukocyte Antigen Test Results Are Admissible in Paternity Cases to Show the Likelihood of Paternity, Turek v. Hardy*, 312 Pa.Super. 158, 458 A.2d 562 (1983), 88 Dick.L.Rev. 565, 567–569 (1984).

vealed a "99.14% statistical probability that the putative father, Mr. John O. [F.], is the biological father of the child, Daniel E. [M.]"

Robert C. voluntarily submitted to HLA blood-tissue testing. The results showed that he was biologically excluded from being the father of Daniel.[4]

The defendant was the only witness in his behalf. He admitted to having sexual relations with the plaintiff in early November of 1987. He stated it was possible that he could be the father of the child.

Prior to submission of the case to the jury, plaintiff's counsel moved for a directed verdict. This motion was denied. The jury returned a verdict for the defendant. The plaintiff moved for a judgment notwithstanding the verdict or, in the alternative, for a new trial. The circuit court denied this motion on April 30, 1993. This appeal ensued.

## II.

The Family Obligations Enforcement Act, contained in W.Va.Code 48A–1–1, *et seq.* (1986), is "a comprehensive measure to broaden the State's role in the enforcement of support obligations via the family law master and child advocate systems." *Kathy L.B. v. Patrick J.B.*, 179 W.Va. 655, 657, 371 S.E.2d 583, 585 (1988). In paternity cases, the child advocate office is commissioned to represent the interest of the child, and "has a duty to assist parents and children in determining paternity and establishing support from the absent parent." Syllabus Point 4, in part, *State ex rel. Div. of Human Servs. v. Benjamin P.B.*, 190 W.Va. 81, 436 S.E.2d 627 (1993).

It is in the State's interest to see that natural fathers, and not taxpayers, support their children. "The primary object of the [paternity] statute is to protect the public against the burden of supporting and maintaining illegitimate children." *Shelby J.S. v. George L.H.*, 181 W.Va. 154, 156, 381 S.E.2d 269, 271 (1989), *quoting Burr v. Phares*, 81 W.Va. 160, 162, 94 S.E. 30, 31 (1917).

4. "The ability of blood grouping tests to exonerate innocent putative fathers has been confirmed by a joint 1976 American Medical Association

The plaintiff contends that the circuit court erred in denying her post-trial motion because the overwhelming weight of the evidence favors her case. We review *de novo* the denial of a motion for a judgment notwithstanding the verdict. *See GSM Dealer Servs., Inc. v. Chrysler Corp.*, 32 F.3d 139, 142 (4th Cir.1994) ("This court reviews *de novo* a district court's denial of a motion for judgment as a matter of law"). It is important, however, to emphasize that it is not the task of the appellate court reviewing facts to determine how it would have ruled on the evidence presented. Its task is to determine whether the evidence was such that a reasonable trier of fact might have reached the decision below. Thus, in ruling on a motion for a judgment notwithstanding the verdict, the evidence must be viewed in the light most favorable to the nonmoving party. If on review, the evidence is shown to be legally insufficient to sustain the verdict, it is the obligation of this Court to reverse the circuit court and to order judgment for the appellant. *See Huffman v. Appalachian Power Co.*, 187 W.Va. 1, 415 S.E.2d 145 (1991); *Mann v. Golub*, 182 W.Va. 523, 389 S.E.2d 734 (1989).

We test the sufficiency of the evidence in a civil case by the standard set forth in Syllabus Point 6 of *McClung v. Marion County Commission*, 178 W.Va. 444, 360 S.E.2d 221 (1987):

" 'In determining whether there is sufficient evidence to support a jury verdict the court should: (1) consider the evidence most favorable to the prevailing party; (2) assume that all conflicts in the evidence were resolved by the jury in favor of the prevailing party; (3) assume as proved all facts which the prevailing party's evidence tends to prove; and (4) give to the prevailing party the benefit of all favorable inferences which reasonably may be drawn from the facts proved.' Syl. pt. 5, *Orr v. Crowder*, 173 W.Va. 335, 315 S.E.2d 593 (1983), *cert. denied*, 469 U.S. 981, 105 S.Ct. 384, 83 L.Ed.2d 319 (1984)."

and American Bar Association report." *Didier v. Fasola*, 597 So.2d 450, 455 (La.App. 1 Cir.1991).

■ Concededly, in paternity actions, the legislature has placed upon the shoulders of the plaintiff a heavy burden of proof.[5] Even when the evidence is viewed in this light, we find insufficient evidence to support the jury verdict for the defendant.

■ To address the issue raised by the plaintiff, we must first examine and interpret the statutory scheme of W.Va.Code, 48A–6–1, *et seq.* This Court reviews questions of statutory interpretation *de novo. See In re JKJ Chevrolet, Inc.,* 26 F.3d 481 (4th Cir.1994). Therefore, our review necessarily begins with an analysis of the specific statutory language. *State of West Virginia ex rel. Estes v. Egnor,* 191 W.Va. 36, 443 S.E.2d 193 (1994); *see Landreth Timber Co. v. Landreth,* 471 U.S. 681, 105 S.Ct. 2297, 85 L.Ed.2d 692 (1985). This Court must interpret a statute in accordance with the plain meaning of the words it uses. *West Virginia Radiologic Tech. Bd. of Examiners v. Darby,* 189 W.Va. 52, 427 S.E.2d 486 (1993); *see United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989).

W.Va.Code, 48A–6–3(a) (1989),[6] states how HLA blood-tissue test results should be considered in a proceeding initiated to establish paternity:

"(1) Blood or tissue test results which exclude the man as the father of the child are admissible and shall be clear and convincing evidence of nonpaternity and the court shall, upon considering such evidence, dismiss the action.

"(2) Blood or tissue test results which show a statistical probability of paternity of more than seventy-five percent are admissible and shall be weighed along with other evidence of the defendant's paternity."

The HLA blood-tissue test results showed that Robert C. biologically was excluded from being Daniel's father. The blood-tissue test performed on the defendant indicated a 99.14 percent probability of paternity. The verified expert's report was admitted at trial without objection. Likewise, there were no objections to Dr. Kramer's qualifications as an expert witness or as the preparer of the report. The defendant did not challenge the testing procedures or the results of the test analysis.[7]

5. The standard in paternity actions under W.Va. Code, 48A–6–4 (1989), is one of clear and convincing evidence:

"If the defendant, by verified responsive pleading shall admit that the man is the father of the child and owes a duty of support, or if after a trial on the merits, the court or jury shall find, by clear and convincing evidence that the man is the father of the child, the court shall order support in accordance with the provisions of this chapter."

This statute was amended in 1993. The commas after "pleading" and "or jury" before "shall find" were deleted. Unquestionably, the legislature may establish and even change judicially adopted burdens of proof. *See State v. McWilliams,* 177 W.Va. 369, 352 S.E.2d 120 (1986).

6. We must note that the 1989 version of W.Va. Code, 48A–6–3, was in effect when this petition was filed. This statute was amended, effective March 7, 1992, subsection (a) now states, in part:

"(1) Blood or tissue test results which exclude the man as the father of the child are admissible and shall be clear and convincing evidence of nonpaternity and the court shall, upon considering such evidence, dismiss the action.

"(2) Blood or tissue test results which show a statistical probability of paternity of less than ninety-eight percent are admissible and shall

be weighed along with other evidence of the defendant's paternity.

"(3) Undisputed blood or tissue test results which show a statistical probability of paternity of more than ninety-eight percent shall, when filed with the court, legally establish the man as the father of the child for all purposes and child support may be established pursuant to the provisions of this chapter."

Accordingly, under the 1992 amendment, paternity in this case would be legally established by the blood test results.

7. On cross-examination, defense counsel questioned Dr. Kramer on the "prior probability" factor and the "random man not excluded" figure. Dr. Kramer stated that for testing purposes, the prior probability factor was set at .5, which is the standard neutral figure used by paternity testing laboratories. To assign a prior probability of less than .5, one would have to possess information about the parties that he did not possess in this case. For instance, he testified that if the "father was in a jail in Alaska when the mother became pregnant in Frederick, Maryland" he would assign a prior probability of .1.

"The standard assumption in calculating the probability of paternity is that the prior probability of paternity is 50 percent.... Studies in Poland and New York City have suggested that this assumption favors the putative father, be-

▮ Additionally, we carefully reviewed the evidence of the expert's report and we find the expert was qualified to interpret the test results.[8] What is more important to the present discussion is the scientific reliability these tests enjoy when made accurately and carefully by competent personnel. Where the foundation is sufficient to show by a preponderance of the evidence the proper testing procedures were employed and the expert witness who interpreted the test results was qualified, courts may take judicial notice of the accuracy and reliability of HLA blood-tissue test results introduced in paternity cases pursuant to W.Va.Code, 48A–6–3 (1992).[9]

Having determined that the blood-tissue tests were properly conducted and that there are no defects in the testing methods appearing from the evidence, the next question presented is what weight and consideration should be given to the blood-tissue test re-

sults in this case. After reviewing W.Va. Code, 48A–6–3, we conclude that paternity was established as a matter of law. Our decision would not be different even in the absence of this statute. "For a court to declare that these tests are not conclusive would be as unrealistic as it would be for a court to declare that the world is flat. This is a court of law, whose prime function is to ascertain truth and administer justice, should not do." *Ross v. Marx,* 21 N.J.Super. 95, 99, 90 A.2d 545, 546 (1952).

▮ For reasons not quite clear to this Court, the circuit court and the parties failed to use or discuss the amendments to W.Va.Code, 48A–6–3, which became effective on March 7, 1992. Although this lawsuit was filed earlier, the trial began on December 22, 1992. We find that the controlling statute is W.Va.Code, 48A–6–3 (1992), as amended.[10]

---

cause in an estimated 60 to 70 percent of paternity cases the mother's accusation of paternity is correct. . . . Of course, the purpose of paternity litigation *is to determine whether the mother's accusation is correct,* and for that reason it would be both unfair and improper to apply the assumption in any particular case." *Plemel v. Walter,* 303 Or. 262, 276, 735 P.2d 1209, 1217 at n. 9 (1987). (Citations omitted). The "random man not excluded" was calculated at 3.3 percent in this case. This result means that approximately one in thirty men falsely accused of being the father of the child would not be biologically *excluded.* This statistic "does not imply that the proportion of the male population capable of fathering" the child is 3.3 percent. *Plemel,* 735 P.2d at 1213.

8. Inculpatory HLA blood-tissue test evidence is not admissible absent a proper foundation establishing that the proper testing procedures were employed and that the expert witness who interprets the test results is qualified. *State v. Franklin,* 174 W.Va. 469, 327 S.E.2d 449 (1985); *State v. Bennett,* 172 W.Va. 123, 304 S.E.2d 28 (1983); *State v. Hood,* 155 W.Va. 337, 184 S.E.2d 334 (1971). This threshold inquiry is made by the trial judge pursuant to Rule 702 of the West Virginia Rules of Evidence. In this case, there was no objection to the HLA evidence, and we can find no basis for an objection from the record.

9. "In general, the courts have moved from an initial position of mistrust of such evidence to the present stage of taking judicial notice of the scientific acceptance or acceptability of serologic and related tests." Charles T. McCormick, *McCormick on Evidence,* § 205, 892 (4th ed.

1992). "General acceptance" is the standard to determine whether judicial notice is proper under Rule 201 of the West Virginia Rules of Evidence. *See State v. Armstrong,* 179 W.Va. 435, 369 S.E.2d 870 (1988). HLA blood-tissue testing has long been recognized as valid and reliable. *See Cleo A.E. v. Rickie Gene E.,* 190 W.Va. 543, 438 S.E.2d 886 (1993); *State ex rel. S.M.B. v. D.A.P.,* 168 W.Va. 455, 284 S.E.2d 912 (1981). *See also Commonwealth v. Beausoleil,* 397 Mass. 206, 490 N.E.2d 788 (1986); *Houghton v. Houghton,* 179 Neb. 275, 137 N.W.2d 861 (1965).

10. To decide whether the introduction of undisputed scientific evidence in this case precluded the jury from finding for the defendant, we must determine whether the 1989 or the 1992 version of the statute controls. As discussed above, the 1992 amendment became effective after the lawsuit was filed but before the trial. Whether a statute is retroactive is governed by the rules of statutory construction. *Rivers v. Roadway Express, Inc.,* — U.S. —, 114 S.Ct. 1510, 128 L.Ed.2d 274 (1994). To determine retroactivity, a court must ascertain the nature of the right involved and must ask whether the right affected by the new legislation is remedial, substantive, or vested. If the right impinged is substantive or vested, it is usually protected from a retroactive application of the statute. *See Pnakovich v. SWCC,* 163 W.Va. 583, 259 S.E.2d 127 (1979). In other words, when the statute deals with these types of rights, the statute is not to be used retrospectively unless plainly so intended. 17 Michie's Jurisprudence *Statutes* § 73 (1979). It has been stated repeatedly that new legislation should not generally be construed to interfere with existing contracts, rights of action, *suits,* or

Subsection (a)(2) provides that blood-tissue test results that show a "statistical probability of paternity of less than ninety-eight percent are admissible and shall be weighed along with other evidence of the defendant's paternity." More significantly, subsection (a)(3) provides:

> "*Undisputed* blood or tissue test results which show a statistical probability of paternity of more than ninety-eight percent shall, when filed with the court, legally establish the man as the father of the child for all purposes and child support may be established pursuant to the provisions of this chapter." (Emphasis added).

A clear and fair reading of the above statute only can mean that, under W.Va.Code, 48A–6–3 (1992), undisputed blood or tissue test results indicating a statistical probability of paternity of more than ninety-eight percent are conclusive on the issue of paternity, and the circuit court should enter judgment accordingly. In this case, the test results indicated a 99.14 percent probability that the defendant was the father. What the circuit court failed to recognize we now make explicit. Under our statute, these results are more than an expression of an opinion upon which the trier of fact may accept or reject; they are a statement of scientifically established fact and are conclusive as to the issue of paternity. The narrow exception to the statute's plain language, arises only when this scientific evidence is *disputed.* There was no such dispute in this case.

▮▮▮ Although we have said in a line of cases that a jury is not bound to accept expert testimony and should evaluate an expert witness as it would any other witness,[11] the jury is not free to reject uncontradicted scientific testimony and to substitute its own speculation in its place. In cases where we have suggested that expert testimony was not conclusive and allowed the jury to reject it, there was ample other testimony reasonably supporting the jury's verdict. In *State v. McWilliams*, 177 W.Va. 369, 378, 352 S.E.2d 120, 129 (1986), we said that "the testimony of expert witnesses on an issue is not exclusive, and does not necessarily destroy the force or credibility of *other testimony.*" (Emphasis added). In cases where expert testimony is uncontradicted and the jury rejects it, there must be ample other testimony reasonably supporting the jury's verdict.

Had the evidence shown that if there were two men who could have fathered the child, or if there were reasons to doubt the plaintiff's credibility, or if there was evidence that the defendant was infertile then the jury's rejection of expert testimony would be justified. *See Cole v. Cole*, 74 N.C.App. 247, 328 S.E.2d 446 (1985). In this case, there is no other evidence contradicting or challenging the expert testimony. The soft, non-scientific evidence also supports the conclusion of paternity. Obviously, HLA blood-tissue tests cannot establish the fact of intercourse, but the defendant conceded that fact at trial. The defendant admitted it was possible he could be the father of the child. He also admitted to having sexual relations with the plaintiff in early November of 1987. In light of this overwhelming evidence, we find that the jury's rejection of this undisputed evi-

---

vested property rights. *Landgraf v. USI Film Products*, —— U.S. ——, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994).

Statutes which do not create new rights or take away vested ones are deemed to be remedial and are not within the strict application of the rule of presumption against retroactivity. *Joy v. Chessie Emp. Fed. Credit Union*, 186 W.Va. 118, 411 S.E.2d 261 (1991). In defining these different types of rights, the Supreme Court of Virginia has commented that "[s]ubstantive rights, which are not necessarily synonymous with vested rights, are included within that part of the law dealing with creation of duties, rights, and obligations, as opposed to procedural or remedial law, which prescribes methods of obtaining redress or enforcement of rights." *Shiflet v. Eller*,

228 Va. 115, 120, 319 S.E.2d 750, 754 (1984). We are of the opinion that to the extent the 1992 amendments create new rights, they are remedial and procedural in nature and the presumption against retroactivity does not apply. *Bradley v. Richmond School Bd.*, 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974); *Pannell v. Inco Alloys Int.'l. Inc.*, 188 W.Va. 76, 422 S.E.2d 643 (1992). West Virginia cases support application of remedial statutes to pending actions especially when, as in this case, the amendment affects only procedure. *Loveless v. State Workmen's Comp. Com'r.*, 155 W.Va. 264, 184 S.E.2d 127 (1971).

11. *State v. Davis*, 180 W.Va. 357, 376 S.E.2d 563 (1988); *Webb v. Chesapeake & Ohio Ry.*, 105 W.Va. 555, 144 S.E. 100 (1928).

dence is unreasonable. With science able to determine with reasonable precision who the father is, to now permit a jury to override uncontradicted scientific evidence that has been statutorily sanctioned, is, in the words of one case, "egregiously unrealistic." *Commonwealth v. D'Avella,* 339 Mass. 642, 645, 162 N.E.2d 19, 21 (1959).

Based on the foregoing, we find that the evidence clearly preponderates against the verdict in this case. Syllabus Point 5 of *Estate of Bayliss by Bowles v. Lee,* 173 W.Va. 299, 315 S.E.2d 406 (1984), states:

> " 'When, upon the trial of a case, the evidence decidedly preponderates against the verdict of a jury or the finding of a trial court upon the evidence, this Court will, upon review, reverse the judgment; and, if the case was tried by the court in lieu of a jury, this Court will make such finding and render such judgment on the evidence as the trial court should have made and rendered.' Syllabus Point 9, *Bluefield Supply Co. v. Frankel's Appliances, Inc.,* 149 W.Va. 622, 142 S.E.2d 898 (1965)."

*See also Huntington Dev. & Gas Co. v. Topping,* 115 W.Va. 364, 176 S.E. 424 (1934).

We, therefore, conclude that the plaintiff has established by clear and convincing evidence that the defendant is the father of Daniel. Accordingly, the order of the Circuit Court of Jefferson County is reversed, and this case is remanded to the Circuit Court for purposes of entering judgment in favor of the plaintiff.

Reversed.

BROTHERTON, C.J., did not participate.

MILLER, Retired Justice, sitting by temporary assignment.