524 S.E.2d 672

**Kenneth M. RODRIGUEZ, Appellee,**

**v.**

**CONSOLIDATION COAL COMPANY, Appellant.**

**No. 26350.**

Supreme Court of Appeals of West Virginia.

Submitted Oct. 5, 1999.

Decided Dec. 3, 1999.

Concurring and Dissenting Opinion of Justice Davis Dec. 8, 1999.

Jacques R. Williams, Esq., Hamstead, Hamstead & Williams, Morgantown, West Virginia, Attorney for Appellee.

Steven P. McGowan, Esq., Ancil G. Ramey, Esq., Steptoe & Johnson, Robert M. Vukas, Esq., CONSOL, Inc., Attorneys for Appellant.

PER CURIAM:

This case is before the Court upon the appeal from the January 4, 1999, final order of the Circuit Court of Monongalia County, West Virginia, denying Consolidation Coal Company's ("CCC") motion for judgment as a matter of law or, in the alternative, motion for a new trial, after a jury returned a verdict against the Appellant awarding the Appellee, Kenneth M. Rodriguez, a total of

$175,000 in back pay and $75,000 in noneconomic damages for retaliatory discharge. The Appellant contends that the lower court erred: 1) by denying the Appellant's motion for judgment as a matter of law where the Appellant offered evidence of a legitimate, non-discriminatory reason for the Appellee's termination and the Appellee failed to offer any evidence of pretext; 2) by denying the Appellant's motion for judgment as a matter of law where, in addition to failing to present any evidence of pretext, the Appellee failed to offer any evidence that he was the victim of "actual retaliation," i.e., that "but for" his allegedly protected activity, he would not have been terminated from employment;[1] 3) by failing to reduce the award of $75,000 in non-economic damages that was not supported by the evidence or, to the extent that some award of non-economic damages was appropriate, was clearly excessive; 4) by failing to reduce the award of $175,000 in back pay where the Appellee was a full-time student during most of his period of employment; 5) by admitting hearsay evidence regarding statements allegedly made by the Appellee to his wife; 6) by admitting a complaint filed by the Appellee with the Mine Safety and Health Administration ("MSHA") more than two months after his discharge; and 7) by awarding prejudgment interest on the Appellee's entire back pay award rather than calculating interest from the dates the Appellee would have been paid had he not been discharged from employment. Based upon a review of the record, the parties' briefs and arguments, as well as all other matters submitted before this Court, we find that the trial court did not err. Accordingly, we affirm.[2]

## I. FACTS

The Appellee was a twenty-six-year-old section foreman[3] at CCC's Humphrey mine in Monongalia County, West Virginia. He had been working for the Appellant since 1992. On October 27, 1996, there was an accident in which David Smith, one of the Appellee's hourly subordinates, was killed. Mr. Smith sustained a fatal massive head trauma when the locomotive he was operating exited the mine portal and collided with the protruding part of a longwall shield which was on the track outside of the mine.

Almost immediately after the fatal accident occurred, the Appellant's officials, including Ronald Stovach, Vice President of Operations in Northern West Virginia, Richard Krynicki, Assistant Superintendent of the Humphrey mine and Elizabeth Chamberlaine, a CCC staff attorney, arrived on the scene. Mine safety inspectors later arrived on the scene as well.

According to the Appellee, miners at the scene began questioning the positioning of Mr. Smith and the locomotive which, in turn, caused the Appellee to think that something was wrong.[4] The Appellee further testified

---

1. The assignments of error numbered one and two are based upon the Appellant's assertion that the Appellee used a pretext theory of retaliatory discharge below. *See Conner v. Barbour County Bd. of Educ.*, 200 W.Va. 405, 409, 489 S.E.2d 787, 791 (1997). The record simply does not support the Appellant's characterization of this case as a pretext case. Accordingly, the Appellant's arguments regarding what the Appellee did or did not prove under a pretext theory of retaliatory discharge have no merit.

 This case was tried under a mixed motive theory of retaliatory discharge. *See* Syl. Pt. 8, *Page v. Columbia Natural Resources, Inc.*, 198 W.Va. 378, 480 S.E.2d 817 (1996). While the Appellant does not even refer to the use of a mixed motive theory in its brief, in its reply brief, the Appellant argues that it is entitled to judgment as a matter of law under a mixed motive theory as well, because the Appellee "admitted that his safety violation, which resulted in the death of Smith, would have warranted his dis-

 charge, irrespective of any other motivation." We address only the Appellant's argument involving the mixed motive theory.

2. Given our decision in this case, we decline to address the Appellee's cross-assignment of error regarding the failure of the trial court to instruct the jury on punitive damages.

3. As section foreman, the Appellee was responsible for supervising a non-production crew charged with construction, maintenance and safety.

4. There is a company requirement, as well as a mine safety regulation, which requires that motormen not operate a locomotive from the end which is proximate to protruding equipment during equipment moves. According to the Appellant's trial exhibit numbered 3, West Virginia Code of State Regulations § 36–4–4.1(m) provided:

that he stated to Mr. Krynicki, "I think I screwed up." The Appellee, stated that Mr. Krynicki responded by saying, "Kenny, I don't know who you have talked to but don't be going around telling people you screwed up."

The Appellee testified that he described what occurred and his involvement in the accident to Elizabeth Chamberlaine and Mr. Stovach. The Appellee stated, however, that either Ms. Chamberlaine or another company official told him that he did not have to talk to state and federal mine investigators until he had retained counsel. Consequently, the Appellee did not give a sworn statement to the investigators until three days later.

Ms. Chamberlaine's testimony confirmed that she informed the Appellee of his rights, as well as CCC's indemnification policy.[5] She stated that the Appellee gave her a brief description of what had occurred and asked her if she thought it was a violation. She informed the Appellee that she could not tell whether a violation had occurred. Finally, she testified that the Appellee told her that he did not wish to make a statement to investigators until he had consulted with an attorney.

The Appellee left the mine and returned home approximately four hours after the accident. In the early evening on the day of the accident, the Appellee was visited at his home by John Higgins, his former supervisor.[6] Mr. Higgins had never been to the Appellee's home. Consequently, both the Appellee and his wife were surprised by his visit. The Appellee testified that Mr. Higgins was not a friend of his. He considered him to be only an acquaintance, because of their former working relationship. The Appellee testified that Mr. Higgins

> When a locomotive is operating on the boom end of the equipment being transported or where there are other conditions that may present a hazard to the locomotive operator because of being in close proximity to the equipment being moved, a flat car, mine car, or similar equipment shall be provided between the locomotive and moving equipment.

5. The provisions of the indemnification policy were not in the record and are not relevant to this Court's decision.

said that he had talked to Dick Krynicki about the accident and Dick was concerned about me, but since he was involved in the investigation that he felt he couldn't contact me. And that John was no longer my superintendent, he was here as my friend, but if he was me he would say that Mr. Smith, he knew that Mr. Smith was going to change motors and Mr. Smith went ahead and changed the motors and that I didn't know that Mr. Smith got an incorrect motor. I just assumed that with his mining experience he would know to get the correct motor and I was in front of the move and never realized he got an incorrect motor until the time of the accident.[7]

. . . .

Q: What was your reaction when he told you that?

A: Right after he said that to me I said, Well, John, that's not what happened. I'm not going to say that. I said, Do you want to know what happened, and I proceeded to tell him all the events that took place that night.

And I recall after I acknowledged to him that I knew the switching of the motors he said, Well, that's going to be a big problem. . . .

. . . .

Q: Was there any truth to what Mr. Higgins told you that when he said, quote, If I were you I would say it happened this way . . .?

A: No.

Q: Did you make it plain to him that that wasn't true?

A: Yes.

Q: Did you know whether he knew that you were going to be talking to inspectors later on that week?

6. Mr. Higgins had been the Appellee's superintendent at the Humphrey mine up until approximately two months prior to the accident. At the time of the accident, Mr. Higgins was the superintendent at the Loveridge mine.

7. If the motorman, Mr. Smith, selected the equipment and the position on his own, then the Appellant could not be held liable. If, however, Mr. Smith acted with the Appellee's knowledge, or under the Appellee's direction, then the Appellant would be exposed to a wrongful death claim.

A: I'm sure he did, yes.

Q: Do you recall if you made the statement to him that the way you described the incident is what you would tell the inspectors?

A: Yes.

....

Q: As one of the two people that were involved in that conversation, what was your impression of the real reason, what was the message that you surmised he was there to deliver to you, one of support and consolation or something else?

A: He was there to tell me that I should lie in the investigation.

Mr. Higgins testified that he found out about the mine fatality almost immediately upon his arrival at work that morning. He later spoke with Mr. Krynicki, the assistant superintendent at the Humphrey mine. According to Mr. Higgins, Mr. Krynicki confirmed to him that the fatality was the result of an improper locomotive/equipment configuration. According to Mr. Higgins, he asked Mr. Krynicki how the Appellee was doing. Mr. Krynicki responded that he hadn't spoken with the Appellee since early that morning. Thus, Mr. Higgins told Mr. Krynicki that he would contact the Appellee to see how he was doing.

Mr. Higgins stated that he first tried to contact the Appellee by telephone, but the line was busy. Mr. Higgins then went to the Appellee's home to "see if he was doing all right." Mr. Higgins testified that the Appellee told him about his involvement in the accident which caused Mr. Smith's death. The Appellee also told Mr. Higgins that he screwed up. Even though the evidence was that Mr. Higgins was a very loyal employee of CCC, Mr. Higgins stated that he never told Mr. Stovach, the CCC official who terminated the Appellee, about this conversation the next day when the two spoke. Further, Mr. Higgins vehemently denied saying anything to the Appellee even implying that the Appellee should lie about the events surrounding the accident. Despite Mr. Higgins' concern for the Appellee on the day of the accident, following this conversation, Mr. Higgins testified that he never again contacted the Appellee.

Shortly after leaving the Appellee's home, Mr. Higgins contacted Mr. Krynicki and reported the conversation he had with the Appellee. Both Mr. Higgins and Mr. Krynicki testified that they never discussed the conversation which took place between Mr. Higgins and the Appellee with Mr. Stovach. Thus, Mr. Stovach denied that he ever had knowledge of the visit between Mr. Higgins and the Appellee, let alone that he used any information obtained from that the visit as a basis for terminating the Appellee.

The evidence presented to the jury, however, revealed that Mr. Stovach and Mr. Higgins were friends and had been friends for several years; that Mr. Stovach and Mr. Higgins spoke by telephone on a daily basis; and, that Mr. Stovach and Mr. Higgins spoke the very next day after the fatality and after the relevant conversation between Mr. Higgins and the Appellee. Yet, Mr. Stovach denied that Mr. Higgins ever mentioned the conversation he had with the Appellee.

Additionally, on the day following the accident, the Appellee was requested by the Appellant's officials to discuss the accident. The Appellee informed the officials that he had not yet consulted with an attorney, so the Appellant's representatives refrained from asking specific questions regarding the accident. The Appellee testified that he did not inform the Appellant's officials about the conversation that occurred the night before with Mr. Higgins, because he assumed they already knew about the visit. Further, the Appellee testified that no other official for the Appellant directly or indirectly asked him to tell the investigators anything different from the inculpatory statements he had already made.

Two days later, the Appellee was interviewed by the federal and state investigators. The Appellant's representatives were present at the interview. The Appellee testified that he answered all of the questions posed by the investigators truthfully. His description of the accident was the same he had previously given to the Appellant's representatives at the time of the incident.

On December 5, 1996, the Appellee received a personal assessment citation[8] after the accident from state officials. The citation read: "The certified foreman [Rodriguez] supervised the equipment move and failed to take prompt corrective action upon observing a violation during the moving of equipment and that protection was not provided between the locomotive operator and the equipment being moved." The Appellee testified that it is highly unusual for personal assessment citations to be issued and that such citations are normally issued to the company, not an employee.

One week later, on December 11, 1996, the Appellee was terminated from employment. The Appellee was informed that the reason for his discharge was the safety violation that resulted in Mr. Smith's death. The Appellee never mentioned his meeting with Mr. Higgins at the time of his termination nor asserted that the reason for his discharge was his refusal to lie. On cross-examination, the Appellee testified that it would not have surprised him to have been fired over what happened even if Mr. Higgins had never been to visit him the night of the incident. The Appellee, however, explained this answer by stating:

I felt that being a supervisor in charge an employee got killed and I gave directions. In other words, I was the one that made the decision to switch motors that led to this fatality, and if the company had a policy regarding the situation like that, I believe it was a fireable offense, but I do not believe that was the reason Consol fired me.

Neither Mr. Krynicki[9] nor Mr. Higgins made the decision to terminate the Appellee's employment, even though they both believed the Appellee's malfeasance warranted discharge. Mr. Stovach, who did make the decision to terminate the Appellee, testified that from the night of the accident, he knew he "had serious concerns" and "would have to take some action with Mr. Rodriguez." Mr.

Stovach stated that the reason the Appellee was not immediately terminated was that he wanted to wait until the state completed its investigation, because he "didn't want to implement a decision that would have any effect on the state investigation." Despite Mr. Stovach's concerns about the Appellee's job performance on the day of the accident, the Appellee continued working in the mines for an additional six weeks after the accident until he was terminated. There was no interruption, alteration, curtailment or any type of modification whatsoever of the Appellee's schedule, assignments, job duties and responsibilities.

After his termination, the Appellee applied for unemployment compensation benefits. The Appellee indicated in the application that the Appellee was wrongfully discharged for a safety violation of which he was not aware, but that "[t]he company has given me nothing in writing regarding my separation. I am filing a grievance regarding the wrongful discharge." The Appellee also filed a complaint with MSHA two months after his discharge in which he stated that he was discharged for refusing to lie. The Appellee withdrew that complaint seven days after it was filed. The reason that the Appellee withdrew the complaint is that he decided that he did not want his case resolved administratively. The Appellee ultimately filed suit against his former employer, the Appellant, and his former supervisor, John Higgins,[10] alleging retaliatory discharge following his termination.

## II. ISSUES

### A. MOTION FOR JUDGMENT AS A MATTER OF LAW

■ The first issue raised is whether the trial court erred by denying the Appellant's motion for judgment as a matter of law. The Appellant argues that it proved by a preponderance of the evidence that the Appellee's

---

8. Other than the issuance being highly unusual, the significance of the personal assessment citation is unclear in the record.

9. Mr. Krynicki, the assistant superintendent, testified that, in his opinion, everyone involved with

the fatal equipment move should have been terminated.

10. The trial judge directed a verdict in favor of Mr. Higgins.

safety violation warranted the Appellee's termination, irrespective of any other motivation the Appellant may have had for terminating the Appellee. In contrast, the Appellee asserts that under a mixed motive theory,[11] the Appellee was entitled to prevail, once he persuaded the jury that management's resentment toward his refusal to participate in a coverup that was going to implicate the Appellant in an expensive wrongful death suit was a motivating factor in his discharge.

 "In considering whether a motion for judgment notwithstanding the verdict under Rule 50(b) of the West Virginia Rules of Civil Procedure should be granted, the evidence should be considered in the light most favorable to the plaintiff, but, if it fails to establish a *prima facie* right to recover, the court should grant the motion." Syl. Pt. 6, *Huffman v. Appalachian Power Co.*, 187 W.Va. 1, 415 S.E.2d 145 (1991). Moreover,

[i]n reviewing a trial court's ruling on a motion for a judgment notwithstanding the verdict, it is not the task of the appellate court reviewing facts to determine how it would have ruled on the evidence presented. Its task is to determine whether the evidence was such that a reasonable trier of fact might have reached the decision below. Thus, in ruling on a motion for a judgment notwithstanding the verdict, the evidence must be viewed in the light most favorable to the nonmoving party. If on review, the evidence is shown to be legally insufficient to sustain the verdict, it is the obligation of this Court to reverse the circuit court and to order judgment for the appellant.

Syl. Pt. 1, *Mildred L.M. v. John O.F.*, 192 W.Va. 345, 452 S.E.2d 436 (1994).

 Further, the standard for reviewing a trial court's ruling arising out of a motion for a new trial is that

[a] motion for a new trial is governed by a different standard than a motion for a directed verdict. When a trial judge vacates a jury verdict and awards a new trial pursuant to Rule 59 of the *West Virginia Rules of Civil Procedure*, the trial judge has the authority to weigh the evidence and consider the credibility of the witnesses. If the trial judge finds the verdict is against the clear weight of the evidence, is based on false evidence or will result in a miscarriage of justice, the trial judge may set aside the verdict, even if supported by substantial evidence, and grant a new trial. A trial judge's decision to award a new trial is not subject to appellate review unless the trial judge abuses his or her discretion.

Syl. Pt. 3, *In re: State Public Bldg. Asbestos Litigation*, 193 W.Va. 119, 454 S.E.2d 413 (1994), *cert. denied sub nom. W.R. Grace & Co. v. West Virginia*, 515 U.S. 1160, 115 S.Ct. 2614, 132 L.Ed.2d 857 (1995).

 We begin our analysis by reviewing the law regarding the mixed motive theory. In syllabus point eight of *Page v. Columbia Natural Resources, Inc.*, 198 W.Va. 378, 480 S.E.2d 817 (1996),[12] we held that:

Once the plaintiff in an action for wrongful discharge based upon the contravention of a substantial public policy has established the existence of such policy and established by a preponderance of the evidence that an employment discharge was motivated by an unlawful factor contravening that policy, liability will then be imposed on a defendant unless the defendant proves by a preponderance of the evidence that the same result would have occurred even in the absence of the unlawful motive.[13]

The only objection to the judge's charge to the jury was that "the charge is not an accurate statement of the law, is misleading, redundant and, we believe, confusing to the jury."

---

11. "'Mixed motive' refers to cases in which a discriminatory motive combines with some legitimate motive to produce an adverse action against the plaintiff." *Skaggs v. Elk Run Coal Co.*, 198 W.Va. 51, 74, 479 S.E.2d 561, 584 (1996).

12. The Appellant raised no specific objection to the jury being instructed on a mixed motive theory. Further, the Appellant's proposed instructions were primarily derived from *Page.*

13. *See* Syl. Pt. 6, *Skaggs*, 198 W.Va. at 59, 479 S.E.2d at 569 (adopting same mixed motive standard for disparate treatment cases under West Virginia Human Rights Act, W. Va.Code § 5–11–9 (1992)).

*Id.* at 382, 480 S.E.2d at 821, Syl. Pt. 8. We further emphasized in *Page,* that

> the plaintiff does have the burden of proving by a preponderance of the evidence that a forbidden intent was a motivating factor in the adverse employment action. While this is a greater burden than that required under the pretext theory, ... we believe it is justified by the fact that, once a plaintiff has met this burden, the burden of persuasion and the risk of nonpersuasion shifts to the defendant.

*Id.* at 390, 480 S.E.2d at 829.

Basically, the Appellant's contention, in the instant case, is that it proved by a preponderance of the evidence that the Appellee would have been terminated even in the absence of the unlawful motive of Mr. Higgins impliedly asking the Appellee to be untruthful to state and federal investigators. *See id.* at 382, 480 S.E.2d at 821, Syl. Pt. 8. The Appellant's argument, however, is fatally premised on its assertion that when it offered an explanation for the termination, the jury was obligated to accept that explanation as true. That is simply not the case. While the Appellant did offer evidence that the Appellee was terminated because of his participation in a safety violation that resulted in the death of a subordinate, the jury obviously did not believe that the reason given was the reason the Appellee was terminated. Thus, the jury rejected Mr. Higgins' testimony that he had gone to the Appellee's home on the night of the accident to "see if he was doing all right." The jury further rejected, apparently, the Appellant's evidence that neither Mr. Higgins nor Mr. Krynicki had ever told Mr. Stovach, the person who terminated the Appellee, about Mr. Higgins' visit to the Appellee's home. Based on our review of the evidence in the instant case, we cannot conclude that the jury verdict was against the preponderance of the evidence. *See* Syl. Pt. 1, *Mildred L.M.,* 192 W.Va. at 347, 452 S.E.2d at 438; Syl. Pt. 3, *In re: State Public Bldg. Asbestos Litigation,* 193 W.Va. at 122, 454 S.E.2d at 416.

## B. NON–ECONOMIC DAMAGES AWARD

■ The next issue is whether the lower court erred in failing to reduce the non-economic damage award of $75,000. The Appellant maintains that the Appellee offered absolutely no psychological or psychiatric evidence of any emotional distress. Moreover, he offered no evidence of any physical manifestations of emotional distress. The Appellee argues that the evidence reveals that the Appellee suffered from embarrassment, periods of marital discord over financial pressures due to his unemployment, as well as depression. The Appellee contends that the reasonableness of the damages is within the jury's purview and, therefore, should not be disturbed on appeal.

■ The Appellant's argument is premised upon our decision in *Ricottilli v. Summersville Memorial Hospital,* 188 W.Va. 674, 425 S.E.2d 629 (1992), wherein we held that "[a]n individual may recover for the negligent infliction of emotional distress absent accompanying physical injury upon a showing of facts sufficient to guarantee that the emotional damages claim is not spurious." *Id.* at 675, 425 S.E.2d at 630, Syl. Pt. 2. The Appellant maintains that only "sparse" evidence of emotional distress was presented. Thus, according to the Appellant, the evidence did not support a $75,000 award of non-economic damages.

In the instant case, the Appellee, as well as the Appellee's wife, testified regarding the emotional distress the Appellee suffered as a result of his termination from the Appellant's employment. This Court has upheld non-economic damage awards based on evidence very similar to that offered by the Appellee. *See Page,* 198 W.Va. at 396, 480 S.E.2d at 835 (refusing to set aside a $150,000 award for emotional distress as excessive and not supported by evidence); *Mace v. Charleston Area Med. Ctr. Found., Inc.,* 188 W.Va. 57, 66–67, 422 S.E.2d 624, 633–34 (1992) (refusing to set aside an emotional distress damage award even in the absence of direct evidence supporting claim). Consequently, we conclude that there was sufficient factual evidence of emotional distress to support the verdict.

■ Further, in response to the Appellant's assertion that the non-economic dam-

age award is excessive, this Court has previously held that "[c]ourts must not set aside jury verdicts as excessive unless they are monstrous, enormous, at first blush beyond all measure, unreasonable, outrageous, and manifestly show jury passion, partiality, prejudice or corruption." Syl. Pt. 1, *Addair v. Majestic Petroleum Co.*, 160 W.Va. 105, 232 S.E.2d 821 (1977). We conclude that the non-economic damage award in the instant case does not warrant reversal under the standard enunciated in *Addair. See id.*

## C. BACK PAY DAMAGE AWARD

■ The next issue is whether the trial court erred in failing to reduce the award of $175,000 in back pay where the Appellee was a full-time student during most of his period of unemployment. The Appellant argues that rather than seeking alternative employment, the Appellee, five months after his discharge, chose to attend college full-time, pursuing a masters' degree. The Appellant asserts that "[m]any courts [14] have recognized that to award an employee back pay for time spent pursuing a full-time education would result in a 'double recovery' and is inconsistent with the 'make whole' approach to compensatory damages."

In contrast, the Appellee argues that the burden was on the Appellant to prove that the Appellee failed to mitigate his damages and the Appellant failed to meet that burden. The Appellee asserts that there was no evidence offered to show that the Appellee declined to accept work that was offered to him. Further, there was no evidence offered to show that work similar to what the Appellee had preformed even existed in the area. Most significantly, the Appellee contends that the Appellant failed to request or offer a jury instruction [15] on the applicable law regarding mitigation of damages and, therefore, should be precluded from raising the issue on appeal.

■ This Court previously held in syllabus point four of *Paxton v. Crabtree*, 184 W.Va. 237, 400 S.E.2d 245 (1990) that:

Once a claimant establishes a prima facie case of discrimination and presents evidence on the issue of damages, the burden of producing sufficient evidence to establish the amount of interim earnings or lack of diligence shifts to the defendant. The defendant may satisfy his burden only if he establishes that: (1) there were substantially equivalent positions which were available; and (2) the claimant failed to use reasonable care and diligence in seeking such positions.

*Id.* at 239–40, 400 S.E.2d at 247–48, Syl. Pt. 4.

In the instant case, it is apparent that the Appellant failed to meet its burden of proving the Appellee did not mitigate his damages. This is evinced not only by the Appellant's failure to offer evidence on mitigation of damages, but the Appellant's failure to even offer a jury instruction as well. Such failures constitutes a waiver of this alleged error by the Appellant and precludes appellate review. *See* Syl. Pt. 1, in part, *Shia v. Chvasta*, 180 W.Va. 510, 377 S.E.2d 644 (1988) (quoting W.Va.R.C.P. 51, in part) ("No party may assign as error the giving or the refusal to give an instruction unless the party objects thereto before the arguments to the jury are begun, stating distinctly, as to any given instruction, the matter to which he objects and the grounds of his objection . . . .").

## D. EVIDENTIARY RULINGS

### PRIOR CONSISTENT STATEMENT

■ The next two issues raised by the Appellant involve evidentiary rulings made by the trial court. The first is whether the trial court improperly admitted hearsay evidence regarding statements allegedly made

14. *See Floca v. Homcare Health Servs., Inc.*, 845 F.2d 108, 113 (5th Cir.1988) ("The time a person spends in school learning a new career is an investment for which future benefits are expected. The student is compensated for the time in school by the opportunity for future earnings in the new career and thus suffers no damages during that period. To allow front pay for this period would compensate the person twice.")

15. The Appellant withdrew its Proposed Instruction No. 18 which would have instructed the jury that the Appellee could not recover lost wages while enrolled in school.

by the Appellee to his wife following his conversation with Mr. Higgins. The Appellee's wife was permitted to testify as follows:

(by Appellee's attorney)

Q: What did you blurt out?

(by Appellee's wife)

A: He blurted out, John Higgins told me to lie. And I looked at him and I said, What? And he said, John Higgins told me to lie in my testimony in front of the investigators. And I said, Wait a minute, Kenny. What are you talking about? And he proceeded to go into this discussion about what their conversation had been and how when John Higgins came into the house they talked a little bit and then he proceeded—

. . . .

Q: Okay. And then what was the substance of the conversation that your husband told you about moments after Mr. Higgins had left the house?

A: Well, at first Mr. Higgins told Kenny, I'm here as your friend. And then he proceeded to say, I don't know all the details of the accident, but if I were you, I would say that Mr. Smith, you believed that he took the right motor and you didn't go back to check on it because you were in the front and you didn't know until you got outside the mines what had happened. And Kenny told me that he said to. Mr. Higgins, I can't say that. That's not what happened.

The Appellee's wife was cross-examined regarding the statement made to her by her husband.

The Appellant contends that the statement is hearsay under the West Virginia Rules of Evidence and that it does not fall within the realm of any of the exceptions provided under the rules. The Appellant argues that the erroneous admission of the statement warrants reversal because the prior consistent statement was not offered to rebut a charge of recent fabrication, but rather was offered in the Appellee's case-in-chief. Further, the Appellant argues that the prior consistent

statement was made after the Appellee had the motive to fabricate his story.

The Appellee, however, asserts that a statement is not hearsay if it is introduced for the purpose of rebutting an accusation of recent fabrication. *See* W. Va. R. Evid. 801(d)(1)(B). The Appellee maintains that one of the Appellant's recurring themes was to accuse the Appellee of lying about the conversation he had with Mr. Higgins. Thus, this statement was properly introduced to contest the Appellant's assertion that the Appellee fabricated the portion of his conversation with Mr. Higgins where Mr. Higgins impliedly asks the Appellee to be untruthful with investigators.[16]

West Virginia Rule of Evidence 801(d)(1)(B) provides:

(d) Statements which are not hearsay.—A statement is not hearsay if—

(1) Prior statement by witness.—The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is . . . (B) consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive. . . .

*Id.*

■ In syllabus point six of *State v. Quinn,* 200 W.Va. 432, 490 S.E.2d 34, *cert. denied,* 522 U.S. 1004, 118 S.Ct. 577, 139 L.Ed.2d 416 (1997), this Court held that:

Under *West Virginia rules of Evidence* 801(d)(1)(B) [1994] a prior consistent out-of-court statement of a witness who testifies and can be cross-examined about the statement, in order to be treated as non-hearsay under the provisions of the Rule, must have been made before the alleged fabrication, influence, or motive came into being.

200 W.Va. at 434, 490 S.E.2d at 36, Syl. Pt. 6.

In the instant case, contrary to the Appellant's assertion, the record is clear that the

---

**16.** The Appellee also argues that the statement was properly introduced as a present sense impression. *See* W.Va.R.Evid. 803(1). Because we find that the statement was properly admitted

under West Virginia Rule of Evidence 801(d)(1)(B), we find it unnecessary to address this argument.

statement was offered to rebut a charge of fabrication. The Appellee testified first and offered his version of the conversation he had with Mr. Higgins. Mr. Higgins later testified that he never directly or indirectly asked the Appellee to lie to state and federal investigators. It was not until after Mr. Higgins testified that the Appellee's wife was called to offer the consistent statement the Appellee made to her regarding the conversation between the Appellee and Mr. Higgins. Further, we find no support in the record for the Appellant's assertion that the alleged fabrication, influence, or motive was in existence prior to the time the Appellee made the consistent statement to his wife. Consequently, the trial court did not err in admitting the prior consistent statement in evidence.

### MSHA COMPLAINT

■ The second evidentiary issue is whether the trial court erroneously admitted a complaint filed by the Appellee with the MSHA more than two months after his discharge.[17] In the complaint, the Appellee alleged that he had been the victim of discrimination based upon his cooperation with officials in the investigation of the fatal accident in which he was involved. The Appellee withdrew the complaint seven days after it was filed, because he decided he did not want the matter of termination decided administratively. Consequently, MSHA did not act upon the Appellee's complaint.

The Appellant asserts that the complaint was totally irrelevant. Moreover, if the complaint had any relevance, the probative value was outweighed by the prejudicial effect.

See W. Va. R. Evid. 401[18] and 403.[19] In contrast, the Appellee argues that this document was introduced to rebut the Appellant's assertion at trial that the Appellee never told anyone about Mr. Higgins' visit prior to filing a lawsuit.

■ " ' " 'Rulings on the admissibility of evidence are largely within a trial court's sound discretion and should not be disturbed unless there has been an abuse of discretion.' *State v. Louk,* 171 W.Va. 639, [643,] 301 S.E.2d 596, 599 (1983)." Syllabus Point 2, *State v. Peyatt,* 173 W.Va. 317, 315 S.E.2d 574 (1983).' Syllabus Point 7, *State v. Miller,* 175 W.Va. 616, 336 S.E.2d 910 (1985)." Syl. Pt. 10, *Board of Educ. v. Zando, Martin & Milstead, Inc.,* 182 W.Va. 597, 390 S.E.2d 796 (1990).

In the present case, we find that the evidence was relevant to contradict the Appellant's evidence that the Appellee had not told anyone about the conversation he had with Mr. Higgins prior to filing suit. Further, we do not agree with the Appellant's assertion that the admission of this evidence was unduly prejudicial. The jury heard that the complaint was not filed for two months after the Appellee was terminated and that the Appellee withdrew the complaint seven days after it was filed, before any action was taken on it. We find that the trial court did not abuse its discretion by admitting the MSHA complaint in evidence.

### E. PREJUDGMENT INTEREST

■ The final issue is whether the trial court incorrectly calculated prejudgment interest on the entire back pay award of $175,-

---

17. The following portion of the statement read to the jury was limited to the written contention about the employer's improper motive:

> I, Kenny Rodriguez, was a section foreman for Consol Coal Company Humphrey # 7 mine[] for 2 ½ years. I was working midnight shift on Oct. 27th 1996 and was in charge of moving longwall shields from inside the mines to the pitmouth. There was an accident at the outside of the mines (supply yard) where an hourly employee was killed. I have made it clear to all Consol officials that I would be honest about the details of the accident, although I was advised by some company officials to do the opposite.

18. Rule 401 of the West Virginia Rules of Evidence provides: " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Id.*

19. Rule 403 of the West Virginia Rules of Evidence provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *Id.*

000. The Appellant argues that the prejudgment interest should have been calculated from the date each payment of salary to the plaintiff became due. In contrast, the Appellee maintains that the trial court correctly awarded the prejudgment interest from the date the cause of action accrued.

As we previously stated in *Gribben v. Kirk*, 195 W.Va. 488, 466 S.E.2d 147 (1995):

> In reviewing a circuit court's award of prejudgment interest, we usually apply an abuse of discretion standard. *See generally Perdue v. Doolittle*, 186 W.Va. 681, 414 S.E.2d 442 (1992). Under the abuse of discretion standard, we will not disturb a circuit court's decision unless the circuit court makes clear error of judgment or exceeds the bounds of permissible choices in the circumstances. However, when the award hinges, in part, on an interpretation of our decisional or statutory law, we review *de novo* that portion of the analysis.

195 W.Va. at 500, 466 S.E.2d at 159.

██ Our prior decision in *Grove ex rel. Grove v. Myers*, 181 W.Va. 342, 382 S.E.2d 536 (1989) is controlling on this issue. In *Grove*, this Court held in syllabus point two that "[u]nder *W.Va.Code*, 56-6-31, as amended, prejudgment interest on special or liquidated damages is calculated from the date on which the cause of action accrued, which in a personal injury action is, ordinarily, when the injury is inflicted." *Id.* at 343, 382 S.E.2d at 537.

██ It is undisputed that an award of back wages is considered special damages, which is subject to prejudgment interest. *See Gribben*, 195 W.Va. at 501, 466 S.E.2d at 160. Moreover, under precedent, as well as West Virginia Code § 56-6-31 (1997), prejudgment interest is calculated from the date the cause of action accrued. *See Grove*, 181 W.Va. at 343, 382 S.E.2d at 537. In the instant case, the trial court concluded that the date the action accrued was the date the Appellee was discharged from employment. We do not find the trial court abused its discretion in calculating the prejudgment interest from the date of the Appellee's discharge. *See Gribben*, 195 W.Va. at 500, 466 S.E.2d at 159.

## III. CONCLUSION

Based on the foregoing, we conclude that the trial court committed no errors. Consequently, we affirm the lower court's decision.

Affirmed.

Judge TOD KAUFMAN sitting by temporary assignment.

Justice SCOTT did not participate.

DAVIS, Justice, concurring, in part, and dissenting, in part:

(Filed Dec. 8, 1999)

I agree with the majority's determination that the trial court did not commit reversible error in this case regarding mitigation of damages; but, I do believe that error occurred in the method used in calculating prejudgment interest. I write separately, therefore, to express my view that this Court needs to revisit and further develop the areas of our law regarding mitigation of damages and prejudgment interest.

As the majority correctly states, the burden regarding the mitigation of damages was on Consolidation Coal Company ("CCC") to establish that there were substantially equivalent positions available to Mr. Rodriguez and Mr. Rodriguez failed to use diligence in seeking such positions. *See* Syl. Pt. 4, *Paxton v. Crabtree*, 184 W.Va. 237, 400 S.E.2d 245 (1990). It is clear that CCC failed to properly preserve any alleged error regarding the issue of mitigation of damages for appellate review.

With that said, I think that CCC raised an important argument regarding a back pay award for the time a plaintiff spends pursuing a full-time education. Consideration should be given to whether the plaintiff is reaping a double recovery which is inconsistent with the make-whole approach to compensatory damages. I agree with CCC's assertion that back pay should not be awarded to a plaintiff who voluntarily exists the job market to become a full-time student.

In fact, other jurisdictions which have addressed this precise issue have similarly held that an award of back pay to a full-time student is a double recovery. The United

States Court of Appeals for the Tenth Circuit in *Taylor v. Safeway Stores, Inc.*, 524 F.2d 263 (10th Cir.1975), addressed the issue of whether the district court had abused its discretion by not including the time the plaintiff attended school in the computation of the back pay award. *Id.* at 267. The Tenth Circuit upheld the trial court's decision, stating

> If a discharged employee accepted employment elsewhere, there is little doubt that this would cut off any back pay award. If not, the employee would be receiving a double benefit for the same period of time. Likewise, when an employee opts to attend school, curtailing present earning capacity in order to reap greater future earnings, a back pay award for the period while attending school also would be like receiving a double benefit.

*Id.* at 267–68; *accord Miller v. Marsh*, 766 F.2d 490, 492 (11th Cir.1985); *Washington v. Kroger Co.*, 671 F.2d 1072, 1079 (8th Cir. 1982); *see Williams v. Trans–World Airlines, Inc.* 507 F.Supp. 293, 305 (W.D.Mo. 1980), *aff'd in part, rev'd in part on other grounds and remanded*, 660 F.2d 1267 (8th Cir.1981) (holding that plaintiff not entitled to back wages for any period of time spent as full-time student); *United States v. Wood, Wire & Metal Lathers Int'l Union, Local Union 46*, 328 F.Supp. 429, 444 (S.D.N.Y. 1971) (stating that plaintiff who chose not to work, but to attend school "may not be deemed to have been 'ready, willing and available,' and thus eligible for compensatory pay ..."); *see also Currieri v. City of Roseville*, 50 Cal.App.3d 499, 123 Cal.Rptr. 314, 319 (1975) (" 'It would seem the duty of mitigation is a continuing duty, within reasonable limits of course, and that to seek and attend to a full time non-paying occupation [e.g. attending school] is not within the concept of mitigation.' "); *cf. Floca v. Homcare Health Servs., Inc.*, 845 F.2d 108, 113 (5th Cir.1988) ("The student is compensated for the time in school by the opportunity for future earnings in the new career and thus suffers no damages during that period. To allow front pay for this period would compensate the person twice.").

As noted by the Fourth Circuit Court of Appeals in *Brady v. Thurston Motor Lines, Inc.*, 753 F.2d 1269 (4th Cir.1985), however, consideration must be given to whether a plaintiff simply chooses to attend school exclusively or whether the plaintiff is working in addition to attending school. *Id.* at 1275–76. As the Fourth Circuit noted:

> We take notice that the vast majority of full-time college students could not hold down a full-time job, and that in the usual case when one decides to attend college on a full-time basis, it does curtail his present earning capacity and effectively removes him from the employment market. So we subscribe to the general rule as laid down in the *Taylor* case. But here the facts are quite different. [The plaintiff] ... remained in the job market which is shown conclusively by the fact that he did maintain a full-time job during all the time he was in college. Prior to obtaining that job, he had unsuccessfully looked for work for a year and had accepted summer employment for less pay than he was making with ... [the defendant company]. It is no use to say that ... [the plaintiff] could have obtained a better job had he looked. He looked for a year. [The defendant company] ... has offered no proof of any better job available during the time that ... [the plaintiff] held his full-time job with the country club as well as attending college full-time.... [W]e do not think he should be penalized merely because he attended college during the time he was so employed. That would seem to us to place a penalty on diligence.

*Id.* at 1276.

Also, consideration must be given to whether a plaintiff, even though in school full-time, remains willing to drop out of school or to reduce the number of hours spent in school if a job becomes available. *See Hanna v. American Motors Corp.*, 724 F.2d 1300, 1308 (7th Cir.), *cert. denied*, 467 U.S. 1241, 104 S.Ct. 3512, 82 L.Ed.2d 821 (1984) ("[W]e agree with the district court that ... [the plaintiff] enrolled in school only because that 'alternative ... was better than anything else [he] had going for him at the moment[,]' " and while attending school,

plaintiff "applied for and was at all times ready, willing, and available to accept employment comparable to that of [the defendant company]."); *Mers v. Dispatch Printing Co.,* 39 Ohio App.3d 99, 104, 529 N.E.2d 958, 965 (1988) ("There was competent, credible evidence to support the jury's finding that . . . [the plaintiff] was available to work while attending college. Therefore, the calculation of the back pay . . . should include the period when . . . [the plaintiff] attended college . . . .").

Accordingly, the law regarding mitigation of damages should be that when a plaintiff voluntarily chooses to exit the job market *solely* to pursue an education as a full-time student, rather than to use reasonable care and diligence seeking substantially equivalent employment positions to the one lost by the plaintiff, that plaintiff should not be allowed to recover any back pay for the time spent as a full-time student.

The only other issue I address concerns the way prejudgment interest is calculated on back pay awards. If any case presented this Court with the opportunity to offer guidance and to fairly and finally resolve the law regarding the calculation of prejudgment interest on back pay awards, this was the case. In the instant case, however, the majority skirted the issue by determining that the trial court did not abuse its discretion in awarding prejudgment interest from the date Mr. Rodriguez was discharged under the law as it currently exists. I believe that the majority should have gone the extra mile in this case and have reexamined whether our prior decision in *Grove ex rel. Grove v. Myers,* 181 W.Va. 342, 382 S.E.2d 536 (1989), is really applicable to back pay awards.

In *Grove,* the plaintiff father brought an action on behalf of his son and himself against a motorist for injuries his son sustained when his bicycle collided with the defendant's automobile. A jury trial was held and the jury returned a verdict awarding the plaintiff the full amount of his medical bills, as well as damages for pain and suffering and for scarring. There were no damages awarded for back pay. *Id.* at 345, 382 S.E.2d at 539. We held that, in a personal injury action, prejudgment interest should begin to run from the date the injury is inflicted. *Id.* at 343, 382 S.E.2d at 537, Syl. Pt. 2.

This Court has never taken the opportunity to address the issue of when prejudgment interest should begin to run on back pay awards. Other courts which have decided this issue have upheld the calculation of prejudgment interest from the date each payment of salary to the plaintiff became due. *See Wilson v. AM Gen. Corp.,* 979 F.Supp. 800, 802 (N.D.Ind.1997) (stating that "prejudgment interest figure [was calculated] by averaging . . . [the plaintiff's] total income over the entire period in question on a monthly basis"); *Zerilli v. New York City Transit Auth.,* 973 F.Supp. 311, 317 (E.D.N.Y.1997) (stating that prejudgment interest on back pay award "is to be calculated based upon the actual month-by-month award"); *Greenway v. Buffalo Hilton Hotel,* 951 F.Supp. 1039, 1063 (W.D.N.Y.1997), *aff'd as modified on other grounds,* 143 F.3d 47 (2d Cir.1998) (stating that " '[t]he objective of fully compensating the plaintiff is best effectuated by dividing the jury's back pay award evenly over the relevant time period for the purposes of calculating prejudgment interest.' "); *Taylor v. Central Pa. Drug and Alcohol Servs. Corp.,* 890 F.Supp. 360, 377 (M.D.Pa.1995) (allowing calculation of prejudgment interest on back pay award "as if paid monthly for period from 7/1/91 to 10/31/93"); *Ryan v. Raytheon Data Sys. Co.,* 601 F.Supp. 243, 254 (D.Mass.1984) (allowing calculation of prejudgment interest on back pay award from the dates payments were due to date judgment entered).

Therefore, I believe this Court's continued reliance on the *Grove* decision for cases involving back pay is inappropriate, because back pay was never an issue in that case. Prejudgment interest on back pay awards should be calculated from the date each payment became due. Under this method, using the instant case as an example, prejudgment interest on Mr. Rodriguez' back pay award would be calculated by dividing the back pay award of $175,000 by the twenty-three months between Mr. Rodriguez' date of discharge and the date of the jury verdict. This method is not only practical, but is also a

better reflection of the prejudgment interest to which a plaintiff is actually entitled. Further, the method is not a mathematical nightmare which would be overburdensome on the trial court.